UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| ANNA MARIA CROWE, KATHLEEN O'DAY, JOANNE CLARKE, DIANE BOWEN, and TIA FINLEY on behalf of themselves and all others similarly situated )<br><br>Plaintiff, )<br>v. )<br><br>EXAMWORKS, INC., EXAMWORKS GROUP, INC. MES GROUP, INC. AND CRYSTAL PATMORE )<br><br>Defendants. ) | Civil Action No. 1:13-cv-10249<br><br><br>LEAVE TO FILE GRANTED<br>FEBRUARY 18, 2013 |

---

## THIRD AMENDED COMPLAINT[1]

## I.   <u>INTRODUCTION</u>

In this action, plaintiffs, on behalf of themselves and all others similarly situated, seek to address a number of wage/hour violations that have occurred in their employment for defendants, both under statutory and common law theories.  The federal claims in Count I are advanced by 4 out of 5 named, plaintiffs Anna Maria Crowe ("Crowe"), Kathleen O'Day ("O'Day"), Joanne Clarke ("Clarke"), and Diane Bowen ("Bowen"), and the federal claims in Count II, as well as the state claims in Counts III-VI are advanced by all 5 plaintiffs, Crowe, O'Day, Clarke, Bowen and Tia Finley ("Finley"). (Bowen and Finley each file opt-in forms herewith).

---

[1]     In this Third Amended Complaint, plaintiffs restate their allegations in a more thorough fashion and without any attachments or exhibits to incorporate by reference, as this Court requested on February 18, 2014.

A.      **Introduction to Counts I and II, the National FLSA Claims Herein**

1.      In Counts I, Crowe, O'Day, Clarke, and Bowen all current and former employees working under the job titles, "Clinical Quality Assurance Coordinator," and "Utilization Review Nurse," allege violations of the Fair Labor Standards Act ("FLSA"), both on their own behalf and behalf of all others as a "collective action" under 29 U.S.C. § 216(b). In short, they allege they were misclassified as exempt during their employment with MES Group, Inc. ("MES") and for all or part of their employment by Examworks Group, Inc./Examworks, Inc. ("Examworks"), who acquired MES in 2011 (Count I). Further, they allege they were denied pay for all time worked/overtime <u>both</u> before they were reclassified <u>and</u> after they were reclassified (Count II) (and Finley simply alleged unpaid overtime without misclassification in Count II). In this regard, the misclassification claim, while important substantively and a common issue in general, only defines a boundary of damages. That is, are these employees in <u>one or both</u> of these two job titles, and the class members they purport to represent, entitled to damages for unpaid overtime before being reclassified and therefore throughout the entire statute of limitations at-issue? Or, are they only entitled to damages for unpaid work/overtime after they were reclassified? As they describe in their affidavits, they worked extra time/overtime in both periods of time without pay.

2.      The allegations supporting misclassification are more fully detailed in Part III below, but such evidence is summarized in bullet points here:

     a.      Their misclassification is supported by the testimony in their four affidavits about what their jobs actually entailed (and relevant excerpts from these

affidavits are quoted below) and one quickly recognizes from these that, although there were two job titles at-issue, the job duties were essentially the same. (See Docket Entry 57, Exhibits 2-3, Docket Entry 76, Exhibit 2 and Docket Entry 78, Exhibit 1) The one difference -- *i.e.,* that Utilization Review Nurses reviewed cases and could approve a request for treatment, whereas Clinical Quality Assurance Coordinators did not -- is a difference without a distinction, because Examworks admits that one did not need to be a learned professional to do that job, as set forth in subparagraphs b-e below.

b.      Their misclassification claim is supported by the job descriptions themselves for the two job titles (and relevant excerpts from these are quoted below too).  One of the job descriptions specifically does not require a nursing degree and the other, the Utilization Review Nurse position job description, states that one need only be a "Licensed Vocational Nurse" to hold the position.

> As a U.S. Department of Labor, Wage-Hour Opinion Letter from 1997 stated:   "the employees in question are licensed vocational nurses (LVN's) who are not exempt from minimum wage and overtime compensation pursuant to 29 C.F.R. 541.3, see 1997 WL 998040."  (As plaintiffs may argue, such an agency interpretation, entitled to deference, warrants summary judgment on liability in favor of Crowe and Clarke, the two Utilization Review Nurse named plaintiffs.)

c.      Their misclassification claim is further supported by the fact that many persons with these job titles who were employed by MES/Examworks were not "Registered Nurses" (which is the required licensure for a "nurse" to be even possibly within the learned professional exemption).  These persons include plaintiff Diane Bowen and other employees employed by Examworks with the same job titles, such as John Mahon and Kevin Martineau.

d.      It is supported by the very fact that, in 2011 and 2012, Examworks

reclassified from exempt to non-exempt Crowe, O'Day and Clarke and at least 65

others nationwide with the same job titles.  In reclassifying them, it stated in all of

their letters as follows:  "This letter is inform you that after reviewing <u>your job</u>

<u>duties</u> against the Federal Standards Labor Act (sic) exemption testing, your

position and job duties no longer qualify you as an "exempt" or "salaried"

employee." (Emphasis added).  <u>But those job duties didn't change overnight.</u>

Further, the reclassification letters referred to them in form letters as "Quality

Assurance Team Members."  (Note:  these reclassifications occurred after

Bowen's employment ended, so she was not one of those who was reclassified.)

At a minimum, viewing the facts in the light most favorable to the plaintiffs, this

letter of reclassification can be reasonably interpreted to be a clear admission of

misclassification.

e.      Finally, it is supported by the affidavit of Examworks' Vice

President of Human Resources, defendant Crystal Patmore ("Patmore"), who

admits that numerous employees who received reclassification letters from

Examworks were <u>not nurses</u>.  In this regard, they are just like plaintiff Diane

Bowen who, had she remained employed long enough, would have been

reclassified too.

3.      All of these four plaintiffs (Crowe, O'Day, Clarke and Bowen), and all

others similarly situated with either/both the Utilization Review Nurse job title and/or the

Clinical Quality Assurance Coordinator job title, worked overtime without pay both

before their reclassification from exempt to non-exempt, and after their reclassification from exempt to non-exempt.

4.     Counts I and II are advanced as national claims because the facts summarized in Paragraphs 2.a-e above are common to all Clinical Quality Assurance Coordinators (and there are an estimated several hundred nationwide) and common to all Utilization Review Nurses (and there are an estimated few dozen nationwide).  If the national claims can be summed up in one short statement, it is this:  Clinical Quality Assurance Coordinators for their part, and Utilization Review Nurses for their part as well, were not paid for all time worked/overtime.  During part of this time, both categories of employees were misclassified.  Thus, the determination of damages applies to the full period of the statute of limitations, but even if they were not misclassified, they still were not paid for all time worked/overtime when Examworks started treating them as hourly employees.  In other words, there is liability either way; it just is a matter of whether Defendants can disprove "misclassification" and, thereby, draw a "virtual line" eliminating one period of the liability.

**B.     Introduction To The Remaining Claims, the State Claims**

5.     The remaining Counts detailed below are <u>state</u> statutory and common law claims.  For plaintiffs Crowe, O'Day, Clarke, and Bowen, the claims they assert under state statutory law essentially overlap with their claims under the FLSA – misclassification and unpaid hours worked/overtime, and is the state version of the same claims. (Count I is brought under G.L, Chapter 149, § 148 and Count II is brought under Chapter 151, §§ 1, 1A).  Plaintiffs have raised and exhausted their Chapter 149 claim

under Chapter 149, Section 150, and their Chapter 151 claim does not require the same administrative procedure.

6.      Finley, who's job title was "Client Coordinator," was treated as non-exempt throughout her employment, but she advances Counts III and IV along with the other plaintiffs as well.  (Finley has also opted in to Count II by filing an opt-in form herewith and, in that capacity, can serve as a named plaintiff for other "Client Coordinators" nationwide who were deprived of overtime by defendants wrongful policies and practices described below).  For their state claims, all 5 plaintiffs together simply claim that they were working extra time and overtime without pay in Counts III and IV (the Massachusetts Wage Act claims), and they seek class treatment of such claims under Fed. R. Civ. P. 23 for reasons further detailed below.

7.      There are approximately 150 current and former non-exempt employees in Massachusetts alone who worked extra time/overtime without pay, more than satisfying the numerosity requirement of Rule 23.  Plaintiffs Crowe, O'Day, Clarke, Bowen and Finley are all adequate class representatives without any issues in their employment or otherwise rendering them inadequate; and their claims are typical of the class, without any unique defenses applicable thereto.

8.      While Finley held a different job title from her fellow plaintiffs, as Finley describes in her affidavit, just like Bowen, Crowe, O'Day and Clarke describe, Finley was not paid for all time worked; in particular, Finley describes how just like Bowen, Crowe, O'Day and Clarke, she (and others) regularly worked through meal breaks and at other times without pay.

9.     The extra time/overtime worked without pay is an unlawful situation itself, but it is also based on common wrongful policies and practices.  Among these wrongful practices were the acts of high level supervisory persons (such as Geraldine Dolan, Michele Bolstad, and John Williams) at Examworks actually modifying employees' time clocks and their records of punching in/out.  In other words, plaintiffs worked more than 8 hours per day, but these high level supervisors communicated to payroll that they only worked 8 hours per day.  Further, these high level supervisory persons directed employees to punch in/out for meals "for the records," and punch in/out for the day at exactly 8 hours per day "for the records," well knowing they were working through their meals.  And, still further, they directed employees to work extra time for such reasons as the computer system being down, all the while not paying these employees for the extra time.

10.     Finally, time records of the defendants show members of the class not getting a full 30 minute break, as is promised to every employee in Massachusetts working 6 or more hours in a day, and sometimes only receiving a 10-20 minute meal break.  This constituted a "breach of contract" under the analysis of the Supreme Judicial Court in *Salvas v. Wal-Mart,* 452 Mass. 337 (2008).  In that case, the SJC noted that meal breaks, as a rest and rejuvenation period and/or a period of time the employee has to him/herself, have a value separate and apart from what an hourly wage may represent.

11.     This "breach of contract" claim (Count V) has a 6 year statute of limitations, and is advanced on behalf of all plaintiffs in Massachusetts, and supported by substantial record evidence summarized below.

12.     Count VI concerns Patmore's specific activity.  When this case was commenced, Examworks sent its Vice President of Human Resources, defendant Crystal Patmore, to Massachusetts to attempt to obtain releases for unpaid wages from members of the Massachusetts class (and, upon information and belief, employees in other locations nationwide).  Patmore attempted to get persons to waive their rights hereunder with invalid waiver and release forms <u>after</u> Ms. Crowe commenced this action because Patmore was well-aware of the above-described abuses of wage-hour rights occurring which, as VP of HR, were her responsibility.  As set forth in Count VI, any such releases obtained should be rescinded.  A sample copy of the form Patmore used is attached to Docket Entry 7, Exhibit D.

## II.     THE PARTIES, JURISDICTION, VENUE[2]

13.     Plaintiff Crowe is an individual residing in Medfield, Massachusetts and worked for Defendants as a Utilization Review Nurse in 2012 and 2013.

14.     Plaintiff O'Day is an individual residing in Norwood, Massachusetts who worked for Defendants as a Clinical Quality Assurance Coordinator from 2007-2013.

15.     Plaintiff Clarke is an individual residing in Worcester, Massachusetts who worked for Defendants as a Utilization Review Nurse from 2007 through the present.

16.     Plaintiff Bowen is an individual residing in Rockland, Massachusetts who worked for Defendants as a Clinical Quality Assurance Coordinator in 2010 and 2011.

---

[2]     In this section, this Court will note that plaintiffs have dropped all individual defendants, except Patmore, and proceed primarily against the corporate defendants.  Moreover, Tia Finley is substituted in as a named plaintiff for former plaintiff, Rebecca Lawrie (both "Client Coordinators").  Nathan Fern is also dropped as a named plaintiff, but is maintained as an Opt-In plaintiff in that he filed an opt in form previously in the case. (Docket Entry 16)  Mr. Fern commenced working for Defendants in December 2012, just before this case commenced.  Although Mr. Fern does have a claim for unpaid work time in the weeks before the complaint was filed, and that claim is being pursued by virtue of his Opt-in form in Count II (or if a class is certified on the claims in Counts III-V), he is not purporting to be a named plaintiff representing a class on any misclassification claim because he has been classified as non-exempt throughout his employment.

17.     Plaintiff Finley is an individual residing in Quincy, Massachusetts who worked for Defendants as a Client Coordinator in 2010 and 2011.

18.     Defendants Examworks, Inc., Examworks Group, Inc. (together, "Examworks") and MES Group, Inc. ("MES") (altogether "Defendants") were, during the statutes of limitations at-issue in the claims herein, the "employer" of the Plaintiffs and class members, responsible for complying with all wage-hour laws in doing so. Moreover, defendant Patmore was an officer/director/high level manager as Vice President of Human Resources, in charge of all wage-hour policies, and rights and obligations of employees to pay for all time worked and meal breaks.

19.     Defendants' business, generally described, is in the IME industry (independent medical exams, peer and bill reviews and related services) and in the industry of facilitating compensation and pension examinations, medical disability examinations, fitness for duty examinations, and all ancillary and related services.  In that capacity, among other things, Defendants functioned as a disability/workers' compensation administrator, working closely with insurers and providers to administer claims.

20.     Defendant Examworks is a national corporation with headquarters in Atlanta, Georgia and offices in 18 states as identified on its website, but with multiple locations in these (and other) of the various United States.

21.     On or about January 11, 2011, Defendant Examworks entered into a stock purchase agreement ("SPA") purchasing defendant MES and all of its subsidiaries, except certain "Excluded Subsidiaries" as defined in the SPA.  MES was then a Michigan corporation with various subsidiaries and locations throughout the country.

22.     On February 8, 2013, this action was removed to this court from the Norfolk County Superior Court pursuant to 28 U.S.C. § 1331 due to the federal question(s) at issue under the FLSA claimed pleaded herein.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331.  Further, this Court is a proper venue given the defendants' substantial conduct of business in Massachusetts.

### III.    ALLEGATIONS IN SUPPORT OF MISCLASSIFICATION

23.     Plaintiffs incorporate by reference their allegations above as if fully set forth herein.

24.     Exemptions from the FLSA's wage and overtime requirements are narrowly construed because the FLSA is a remedial statute.  See A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 (1945).  One did not need to be the kind of nurse that would fall within the "learned professional" exemption of the FLSA to perform the Clinical Quality Assurance Coordinator job, or the Utilization Review Nurse job.  This allegation is based on several pieces of evidence.

A.     **This Utilization Review Nurse And Clinical Quality Assurance Coordinator Job Descriptions Are Strikingly Similar And They Do Not Require A "Learned Professional" Type Degree, as Confirmed By A U.S. DOL Opinion Letter; Moreover, Persons Perform These Near Identical Jobs Who Are Not "Learned Professionals"**

25.     The Utilization Review Nurse and Clinical Quality Assurance Coordinator job descriptions have striking similarities and both job descriptions admit to minimal qualifications that do not rise to the level of a "learned professional."

26.     The Clinical Quality Assurance Coordinator job description, of which there are an estimated hundreds nationwide, provides that the position is responsible for ensuring "Peer Review Case Reports are of the highest quality and integrity and are in

10

full compliance with client contractual agreements, regulatory agency standards and/or federal and state mandates."  (See Docket 57, Exhibit 5 "Summary").  Although it says one must be a graduate of an accredited nursing program, then, in juxtaposition, it specifically states under Certificates, Licenses or Registrations:  "No specific requirements."  (Id. compare "Certificates, Licenses, and Registrations" section with "Education And/Or Experience.")  Then, under "Qualifications," it states:  "Must have strong knowledge of medical terminology, anatomy and physiology, medications and laboratory values." (Id.)

27.     The Utilization Review Nurse Auditor job description provides similarly: "This position ensures reports are completed with the highest quality and integrity and are in full compliance with client contractual agreements, regulatory agency standards and/or federal and state mandates." (See Docket 57, Exhibit 2, Tab 3 thereto)  It says one must be an "Active Registered Nurse, Licensed Practical Nurse or Licensed Vocational Nurse," (id. (emphasis added), but a 1997 U.S. DOL Opinion Letter recognizes that a Licensed Vocational Nurse is not an exempt position. (See Paragraph 2.b above)  In other words, one does not need to be  "learned professional" to do that job, and even if such qualifications might be preferred, they are not "required."  Then, identical to the Clinical Quality Assurance Coordinator job description, under Qualifications, it states:  "Must have strong knowledge of medical terminology, anatomy and physiology, medications and laboratory values."  (Id.)  If "strong knowledge" of medical terminology, etc. is all that is needed to do the Clinical Quality Assurance Coordinator job, which specifically states that no nursing degree is required, the same "strong knowledge" which is required for the Utilization Review Nurse position suffices.  To be sure, an individual who takes

11

anatomy/biology, etc., or grew up in a family of medical professionals, may have the same "strong knowledge," without any nursing degree at all.

28.      Different from the Clinical Quality Assurance Coordinator job, the Utilization Review Nurse job requires the employee to be able to review files within state workers' compensation/office of disability guidelines to "approve" care requested by a physician, but because this is done within strict guidelines (as described below), it does not distinguish the job in such a way as to require the kind of degree that falls within the learned professional exemption.  In fact, in her affidavit, Bowen describes how she was a Clinical Quality Assurance Coordinator, and in her job, she inspected files from a clinical perspective for accuracy medically (see Docket 76, Exhibit 2, ¶ 3), and yet, as set forth above, this job description notes that there are "No specific requirements" for education or training.

29.      Defendants have persons working in both of these jobs nationwide who are, LPN's, LVN's or not even nurses at all, including John Mahon and Kevin Martineau here in Massachusetts, not to mention plaintiff Bowen herself.

**B.      The Affidavits Of Crowe, O'Day, Clarke and Bowen Explain That One Did Not Need To Be a Learned Professional To Do These Jobs**

***The Daily Functions Of The Utilization Review Nurse***

30.      <u>*Direct Quotes From Crowe's and Clarke's Affidavits, Who Are the "Utilization Review Nurse" Named Plaintiffs.*</u>  Set forth below are direct quotes from Crowe's affidavit (Docket Entry 57, Exhibit 2) and Clarke's Affidavit (Docket Entry 78, Exhibit 1) as to the reasons why they did not need to be a nurse to do the Utilization Review Nurse job.

31.      At Examworks, their title was Utilization Review Nurse.  For

example, if a worker got injured on the job, the provider of the medical care for the worker will, through the employer or insurer, send the case to Examworks to determine "medical necessity" of the treatment proposed.  They describe their role in that process below.

32.     Massachusetts, like most states, has workers' compensation treatment guidelines ("WCGuidelines") as well as Official Disability Guidelines ("ODG").  Their job was to review a proposed treatment ("prospective"), ongoing continued treatment ("concurrent review"), or review a request to justify a treatment that had already occurred ("retrospective") and determine if it fit within the respective guidelines.

33.     Crowe attaches Guideline Number 1 of the WCGuidelines (regarding Carpal Tunnel Syndrome) as Tab 1 to her Affidavit as an example. (See Docket Entry 57, Exhibit 2, Tab 1 thereto)  As set forth therein, certain requests for medical treatment were "Allowable" in the initial 8 weeks of treatment. (See id. Part VI).  If a medical provider requested approval for treatment, and it was within the initial 8 weeks, Crowe could approve it.  The same applied for a number of other things organized by the WCGuidelines and/or ODG, such as how many physical therapy visits were permitted after a particular injury. Every determination was based on three criteria; diagnosis, date of injury and the affected body part.

34.     At Examworks, they could say "yes" to the treatment, but only if was within the protocol of the guidelines or, as Clarke notes, within 10% of the guidelines if they were using the Massachusetts guidelines.  On the other side of

the coin, they could not say "no."  If a request for treatment fell outside the

protocol of the guidelines, and they would otherwise have to say "no," they could

not do so themselves.  Instead, they would have to send the file to "Peer

Review," where they understood doctors, Physical Therapists ("PT") and

Occupational Therapists ("OT"), would review the request and make a

determination.  After the doctor(s)/PT's or OT's made a determination and

prepared notes about that determination, they would then write a letter

transcribing what the doctor decided.

35.     A good example of this is a request for an MRI.  According to the

ODG, in order to approve an MRI, an injured worker had to have an X-Ray first.

If the X-Ray was normal, and there was still pain, they could approve the MRI.

If the X-Ray was not normal, the injured worker was not permitted to have an

MRI.  So if the worker's health care provider recommended an MRI despite an

abnormal X-Ray, they would have to send the request to "Peer Review."

36.     Both Crowe and Clarke feel that anyone who could read the

pertinent guidelines or learn basic things like the MRI example above could have

done their job.  In fact, as Crowe describes, there was a book that followed the

pertinent guidelines, in essence, had "green" lights and "red" lights that the

employees could look at to tell them if something could be approved.  To prove

the point that anyone who could read the guidelines could do her job, persons

were doing their job at Examworks who were not "Registered Nurses" ("RN")

What also proves the point that they did not need to be an RN to do their job is

that they were given no discretion to deny treatment.  Further, part of their job

14

when they approved a case, or when they sent a case to "Peer Review" to see if it could be approved, required them to write up the rationale for what they were doing. This job duty was simply done by transcribing the history of the claim/injury as set forth in the paperwork from the provider and articulating on paper what the pertinent guidelines stated. It did not require RN training.

37.     They certainly did not need to be an RN to transcribe a doctor's note after a doctor reviewed it at the "Peer Review" level. That could be done by anyone, and it essentially amounted to clerical/secretarial work. In addition, they had to write several types of letters, and Crowe describes three types; a letter introducing MES/Examworks as the reviewer to the claimant, extension letters (*i.e.,* if a treatment needed to be extended with new dates), and additional information letters requesting missing information from the provider that were needed to review the case. These were all time consuming and they were also clerical/secretarial in nature. Clarke notes that there were other letters as well, largely administrative, and not requiring a nursing degree either. Crowe further notes that a number of them, herself included, also had to serve as a clerical assistant in another way with the phone system. This was a "round robin" responsibility in which they had to answer the phone in the queue that it came in and transfer calls as appropriate. Supervisors would check to see if they were logged into the round robin system and check on how many calls were missed. This slowed down the process of getting through the case files and added to the extra time/overtime they needed to get through those files. This was not these employees' only phone responsibility. They also had to check the general line to

see if there were messages left and relay the messages to whoever was required.

38.     At Examworks, Crowe felt like a production-level employee, processing claims within predetermined guidelines.  She felt like a factory worker that way, with files lined up in a pile/cubby that she had to process in order to get through the day.

39.     At MES/Examworks, Clarke believes it has been helpful to have a nursing background, and she feels she can more efficiently handle her job because of her understanding of medical terminology, but she does not believe her degree is required for her to be able to do her job.  As she points out, her team has others working for it who do not have the same amount of training or professional responsibilities.

### *The Daily Functions Of The Clinical Quality Assurance Coordinator*

40.     *Direct Quotes From O'Day's Affidavit and Bowne's Affidavit, Who Are the Clinical Quality Assurance Coordinator Named Plaintiffs.*  Set forth below are direct quotes from O'Day's Affidavit (Docket Entry 57, Exhibit 3) and Bowen's Affidavit (Docket Entry 76, Exhibit 2) as to why they did not need to be a nurse to do their Clinical Quality Assurance Coordinator jobs.

41.      In their Clinical Quality Assurance Coordinator jobs for MES/Examworks, they also dealt with insurance companies and physician reviewers.  A doctor's office would ask the insurance company for approval for a certain procedure or treatment.  If the insurance company felt it was questionable, it hired MES/Examworks.  In their roles, they would look at the file and determine which physician reviewer should review the case.  Then, they

would contact the appropriate reviewer.  The physician would examine the file,

potentially contact the doctor, and then make recommendations based on state or

national guidelines.  The physician's report would then be filed.  The Clinical

Quality Assurance Coordinator would then access the report and make sure it

answered the questions, was in the proper format, was grammatically correct, and

had all of the information it needed in it, and then the company would send it

back to the insurance company.

42.     O'Day and Bowen both testify that they did not need to be a nurse

to do their job at MES/Examworks.  Many people did this job who were not

nurses.  O'Day felt her job could be taught to anyone with a reasonable degree of

intelligence and computer skills.  The learning curve was easier for nurses, but it

was something someone else could learn.

**C.     Defendants Reclassified Utilization Review Nurses and Clinical
Quality Assurance Coordinators and Defendants' Vice President of
Human Resources, Crystal Patmore Testified That Persons
Reclassified Were Not Nurses**

43.     Defendants reclassified Utilization Review Nurses and Clinical

Quality Assurance Coordinators, including more than 30 in Massachusetts alone,

and including plaintiffs Crowe, O'Day and Clarke (Bowen stopped working in

2011 before the reclassifications occurred in 2012).

44.     Defendants reclassified more than 65 such persons nationwide but

this is based on Defendants' admitted "incomplete" research and, as Patmore

testifies in her affidavit, <u>only 50 were nurses</u> and others had different titles and

jobs. (<u>See</u> Docket Entry 57, Exhibit 1)

45.     However, it is important to note that these 65+ persons do not define the scope of the national class because, like Bowen, there are/were hundreds of Clinical Quality Assurance Coordinators working nationwide extra time/overtime without pay before this job title was reclassified from exempt to non-exempt, and 100s of such persons were, like Bowen, not nurses.

46.     It is important to emphasize certain points about Defendants' reclassification letters.  The form letter to both Utilization Review Nurses like Crowe and Clarke, and Clinical Quality Assurance Coordinators like O'Day, stated:  "This letter is inform you that after reviewing your job duties against the Federal Standards Labor Act (sic) exemption testing, your position and job duties no longer qualify you as an "exempt" or "salaried" employee." (Emphasis added).  But those job duties didn't change overnight.   Further, these letters were form letters from the West/Central regions of the company addressed as follows: "Dear Quality Assurance Team Member," which reflected that all employees who received these, nurses and non-nurses alike, were viewed as part of the same "Quality Assurance" team, with the same or substantively similar, job duties – *i.e.* those not requiring an advanced nursing degree.  (A sample of the form letter sent was attached as an Exhibit to Docket Entry 7, and Docket Entry 57.)

47.     Crowe, O'Day and Clarke, all received these letters, either in April 2012 or September 2012.  They were all signed from by a Director of Human Resources from the Western and Central Regions of Examworks.

48.     In short, based on the above, Defendants misclassified either the hundreds of Clinical Quality Assurance Coordinators, or the dozens of

Utilization Review Nurses <u>but, more likely,</u> Defendants misclassified both job positions.

## IV.    ALLEGATIONS IN SUPPORT OF WORKING EXTRA TIME/OVERTIME WITHOUT PAY

49.    All named plaintiffs submit affidavits describing working extra time/overtime without pay and working through meal breaks without pay based on common wrongful policies and practices, and with supervisory knowledge (and often, supervisory direction to do so).

50.    Crowe states in her affidavit:  "Both before I was reclassified as non-exempt and after, I worked 7-10 hours per week over 40.  These 7-10 hours were spent during lunch breaks and at the end of the day trying to help empty the "cubby" with the files.  My supervisors knew I was working these extra hours, including during meals, as they witnessed it, but they ignored it, as they recognized that in order to meet deadlines and keep "production levels" high, the files needed to be processed."  (<u>See</u> Docket Entry 57, Exhibit 2, ¶¶ 11, 12)

51.    O'Day states in her affidavit:  "Before Examworks took over, I had a salary.  I worked a 40 hour per week position and I got paid a salary for those 40 hours.  There were also occasions I worked extra time when I had the salary (such as through lunches or staying late), and was paid for the extra time when it was approved.  There were other times I was not paid for the extra time, approximately 2-5 extra hours per week.  The company knew whenever I was working extra hours because when we closed cases, it was all time-stamped.  When Examworks took over the company, I recall becoming a 32 hour per week salaried employee but not needing to sign in/out.  I would sometimes work more

than 32 hours (again, approximately 2-5 hours per week), but I would still be paid for 32 hours.  When it came time to be paid for a holiday (4th of July, 2011 I believe), I was not paid for the holiday.  I felt I should have been entitled to pro rated holiday pay if I was promised pay every week as if I was working 32 hours.  Then, in April 2012 I believe, I recall receiving a letter telling me that I was "nonexempt" and from then on, I needed to sign in/out.  For a while, it didn't matter how late I stayed or whether I clocked in/out for lunch.  If I had any hours over my pre-approved 32 hours, I was not paid.  Again, I would estimate that I worked 2-5 extra hours per week in this time frame.  When Anna Maria Crowe started this case just before I left the company, everything changed.  Myself (and others to my knowledge) now had to clock in/out for lunch and we could no longer work through lunch.  Also, once we clocked out for the day, we could no longer stay late and keep working.  The company made sure that we did not work any extra hours and that our time records accurately reflected our hours, which was different prior to Anna Maria Crowe starting this case." (See Docket Entry 57, Exhibit 3, ¶¶ 5-7)

52.    Clarke states in her affidavit:  "Before this lawsuit, I regularly worked through lunches and stayed late to finish cases, and I was not paid for the time.  In my estimation, I worked 5-7 extra hours per week without pay from 2007 to when this lawsuit began.  I also worked one Sunday for 6 hours without pay.  I worked without pay both before I was reclassified from a salaried employee to an hourly employee, and after I was reclassified from salaried to hourly.  Before I was reclassified, I worked the extra hours not even thinking I

should be paid for them.  I was under the impression that because I was salaried, I would not be paid.  After I was reclassified, I was supposed to punch in/out for work and meals, but I would still work extra hours without pay.  In fact, Geraldine Dolan, the Director in Norwood, told us to punch in/out for meals regardless of whether we worked through them or not.  I felt it was not fair to punch in/out as if I wasn't working when I truly was.  After this lawsuit began, everything changed.  We were told not only to punch in/out for meals but we were also told to avoid working through meals or working beyond our scheduled hours.  However, if we did work through meals or stay late, we were told we would have to inform Ms. Dolan.  Because of this, we now rarely work through lunches and rarely work beyond our scheduled hours.  When I do so, I inform Ms. Dolan by email, and I am paid my overtime hours as a result.  My overtime hours are now approximately 2 hours per week now that the company strictly attempts to ensure we are paid for all of our time."  (See Docket 78, Exhibit 1, ¶¶ 5-7)

    53.    Bowen states in her affidavit:  "I was paid a salary for my time.  I never was reclassified from salary to hourly.  I do not recall the exact amount.  This salary was not intended to cover any overtime hours and I did work a number of overtime hours.  I also regularly worked through meals and I only took a lunch on very rare occasions.  I had a quota to meet and if I did not meet that quota, I was reprimanded.  I was in constant fear of losing my job, therefore, felt as if I had no choice but to work through my allotted lunchtime.  I also worked many times at night without being paid.  Most times this would be

because the company's antiquated computer system would again crash, sometimes for hours at a time, putting everyone behind in their work.  On rare occasions we would be paid for this work, but it was not the norm to be paid for this time.  I was very rarely paid for staying late and never was I paid for working through my lunchtime.  My supervisor, Patricia Troiano, always knew I was working through meals and extra hours.  Ms. Troiano's direct supervisor, Michelle Bolstad, was also aware that I worked through lunch hours and stayed late without compensation.  There were several cliques at MES/Examworks.  Some, depending on which manager they were friends with or they were related to, did not hold up their end when it came to meeting quotas, forcing others to work harder to complete the list of cases due for the day, hence working through lunch hours and staying late." (See Docket Entry 76, Exhibit 2, ¶¶ 4-6)

54.     Finley states in her affidavit:  "My supervisor was Andrea Williams (who I now understand to be Andrea Turner).  Andrea specifically told me and others that if we worked overtime, the company would not pay us for the overtime because it did not have the money to do so.  Andrea would sometimes ask me to work overtime, and I would say, "yes," work the hours, and then I would look at my check and see that I was not paid the overtime hours.  In fact, once a month, the company would pretty much ask everyone to work extra hours (for example, due to a computer problems), and then would not pay for the extra hours.  Once I saw that I was not getting the overtime in my checks, I stopped agreeing to work overtime.  I regularly worked through my lunches and/or had my lunches cut short with Andrea's knowledge throughout my employment.  For example, if I was on a call that took me past my scheduled lunch time, I would be allowed by Andrea

to go to lunch when the call ended, but then I'd be asked to come back sooner so the next

person could go.  I would estimate that I worked 5-6 extra hours per week without being

paid for the time, and assuming I worked 40 hours per week as a full-time employee, that

would have included overtime hours." (See Docket Entry 76, Exhibit 1, ¶¶ 3-7)

     55.    What Crowe, O'Day, Clarke, Bowen and Finley write in their affidavits is

not even the full story of them (or others) not being paid for all time worked/overtime.

     56.    Dolan, Bolstad, and John Williams (the Vice President of Examworks for

all of Massachusetts and former minority shareholder for MES), knew the employees

above, and all others similarly situated, were working extra hours without pay.  They

specifically sought that work, but did not pay for it, and they manipulated time records

when transmitting them to payroll, to avoid paying employees for all hours worked and

overtime.  Indeed, Plaintiffs did not just work extra hours/overtime without pay, but

Defendants willfully defrauded Plaintiffs of pay for all time worked, through Dolan,

Bolstad and/or John Williams, because Examworks was transmitting to payroll

information that Plaintiffs, and others, only worked 8 hours per day when, in actuality,

their punch in/out records reflect them working more than 8 hours per day.  Records

attached to Crowe's original amended complaint in this matter, Docket Entry 7, Exhibits

2 and 3 thereto reflect this discrepancy, in one 2 week pay period.  However, it happened

in numerous other pay periods not only to Crowe but to all employees whose payroll

Dolan and/or Bolstad handled, which was everyone in Massachusetts.

     57.    Other times, these supervisory personnel (either directly or by instruction

to lower level supervisors) were requiring employees to clock in/out for "exactly" 8 hours

and either literally or figuratively "looking over their shoulders" to make sure their time

records equaled exactly hours, all the while knowing the employees were putting in extra time/overtime.

58.     Plaintiffs and class members all worked extra hours without pay, because the nature of Defendants' business was such that cases needed to processed in a timely fashion and Defendants had such large volumes of work at low margins that the "norm" was for employees to work the extra time to keep the "factory" running.  This applied to Utilization Review Nurses and to Clinical Quality Assurance Coordinators.  And it applied to "Client Coordinators," who simply processed paperwork for claims.  In these "Client Coordinator" positions, employees like Finley (approximately 50 in Massachusetts alone and hundreds nationwide) communicated with clients by email and phone; they organized paperwork for third parties; they scheduled medical reviews and sent doctors appropriate paperwork for such reviews properly organized; they communicated with doctors about the results of their reviews and collected and processed that information for Defendants' clients, the insurers.  The amount of administrative work to be done, and the pressure set by the insurance companies on MES/Examworks to be efficient, productive and accurate, required substantial extra time.  Due to the low margin/high volume and highly competitive business and industry, there was substantial pressure placed on Client Coordinators to process cases off the clock.  In essence, Utilization Review Nurses, Clinical Quality Assurance Coordinators and Client Coordinators (all of the plaintiffs and similarly situated class members with the same job titles) were "production-oriented" much like factory-workers in a manufacturing or production facility.

59.     Due to the nature of these three jobs in particular, there was constantly work that could be done, calls and correspondence that could be sent, and paperwork that needed to be organized or prepared.  Due to scheduling issues, there was, on a weekly basis, a need to put in extra time, off-the-clock, both during meal breaks and before and after scheduled shifts.

60.     Defendants have admitted that they are not in possession of all of the records of all hours worked of the named plaintiffs and many of the class members. Accordingly, Defendants will not be able to meet their burden of proof that they paid plaintiffs and class members for all hours worked.

61.     Upon notice of the complaint filed in Norfolk Superior Court on January 13, 2013, the Defendants (through Patmore) have attempted to coerce members of the class both in Massachusetts and nationally into waiving their rights to all wages due. They are being asked to sign agreements in the form attached to Docket Entry 7, Exhibit D which state that they are being paid money "in full settlement" of wages due. Defendant Patmore, on behalf of all defendants, was on-site in Norwood on or about February 7, 2013 engaging in coercive communications with putative class members, failing to properly inform them of all of their rights to wages (including, treble damages, liquidated damages, interest on late payment of wages, wages for meals, wages for hours worked (including overtime) when they were misclassified as exempt), and attempting to get them to sign that form Exhibit D to Docket Entry 7.   Many putative class members did sign that document but any such agreements should be rescinded as procured by intentional and/or negligent misrepresentations.

## V.     CAUSES OF ACTION

**Count I:  Violation of Section 206/207 of FLSA - misclassification**

62.     Plaintiffs and the class members repeat and reallege the above as if fully set forth herein.

63.     Nationwide, defendants misclassified as exempt, named plaintiffs Crowe, O'Day, Clarke and Bowen, all with the Clinical Quality Assurance Coordinator and Utilization Review Nurse job titles, and all similarly situated class members in Massachusetts and nationwide with the same job titles.

64.     This Court should find that either or both job categories were misclassified and either finding constitutes a violation of the FLSA.

**Count II:  Violation of Section 206/207 of the FLSA:**

**Deprivation of Pay for all hours worked/overtime**

65.     Plaintiffs repeat and reallege the above as if fully set forth herein.

66.     Defendants deprived Crowe, O'Day, Clarke, Bowen and Finley, and, nationwide, all other similarly situated Clinical Quality Assurance Coordinators, Utilization Review Nurses and Client Coordinators of pay for all time worked/overtime. This deprivation of pay for all time worked/overtime was both <u>before</u> any reclassification that occurred for the former two job titles (in other words, while they were misclassified) and <u>after</u> the former two job titles were reclassified and changed to hourly non-exempt employees.  It happened throughout the statute of limitations for Finley's Client Coordinator job category.

67.     Defendants' conduct was a violation of the FLSA and willful.

68.     Plaintiff and all others similarly situated hereby demand back pay for 3 years, liquidated damages, interest and attorneys' fees.

## Count III:  Violation of M.G.L. Chapter 149, Section 148

69.    Plaintiffs and the class members repeat and reallege the above as if fully set forth herein.

70.    In violation of Massachusetts law, Chapter 149, Section 148, defendants misclassified as exempt named plaintiffs Crowe, O'Day, Clarke and Bowen, all with the Clinical Quality Assurance Coordinator and Utilization Review Nurse job titles and similarly situated class members in Massachusetts with the same job titles.

71.    This Court should find that either or both job categories were misclassified and either finding constitutes a violation of the G.L. c. 149, § 148.

## Count IV:  Violation of Chapter 150, Section 1, 1A.

72.    Plaintiffs and the class members repeat and reallege the above as if fully set forth herein.

73.    Defendants deprived all plaintiffs (Crowe, O'Day, Clarke, Bowen and Finley) and all other hourly non-exempt employees in their job titles in Massachusetts (Client Coordinator/Clinical Quality Assurance Coordinator/Utilization Review Nurse), which was over 100 of them, pay for all hours worked, including overtime.  For Crowe, O'Day, Clarke, and Bowen and all others in their job titles, this occurred both before they were reclassified, and after.  For Finley, and all others in her job title, this occurred throughout the statute of limitations.

74.    Defendant's conduct was willful.

75.    Plaintiffs and all others similarly situated hereby demand their back pay, treble damages, interest and attorneys' fees.

## Count V:  Breach of Contract

27

76.     Plaintiffs and the class members repeat and reallege the above as if fully set forth herein.

77.     The Defendants contracted with the plaintiffs and class members to pay them for all hours worked.  The Defendants also contracted with the plaintiffs and class members to promise them a meal break, a break which has an inherent value beyond an employee's hourly rate.  See *Salvas v. Wal-Mart*, 452 Mass. 337 (2008).

78.     The Defendants breached these promises throughout the statute of limitations at all locations in which they operated in Massachusetts during the statute of limitations.

79.     Defendants' breaches were not just with the named plaintiffs in Massachusetts, but with all other class members in Massachusetts.

80.     From records plaintiffs have so far, which are not for every employee, and not for the full statute of limitations for the claims at-issue, other class member employees who had numerous occasions of "no lunches" at all during their work days include, without limitation, not just the plaintiffs but also Julianne DiCastro-Nascenzi, Ana Kearnan, Karen Ann Quinn, Lisa Howland, Kristine Bolstad, Anthony Mastroianni, Mary Ann Picozzi, Azure Denise Horton, Heidi Lynn Ford, Joseph Whittemore, Renee Moore, Joanne Kane, Alison Lee MacNeil, Shannon Marie O'Neil, Bernadette Amber, Jessica Guidaboni, John Mahon, Patrick Doyle, Catherine Forde, David Kelly, Kathleen Kenneally, Maureen Ahern, Robin Davis, Alan O'Connell, John Conroy, and Debra Lorenzo.

81.     Additionally, from records plaintiffs have so far, which are not for every employee, and not for the full statute of limitations for the claims at-issue, other class

member employees who had numerous occasions of mere 10-20 minute meal breaks, as

opposed to the promised 30-60 minutes meal breaks included, without limitation,

Anthony Mastroianni, Mary Ann Picozzi, Azure Denise Horton, Renee Moore, Joanne

Kane, Alison Lee MacNeil, Shannon Marie O'Neil, Joseph Whittemore, David Kelley,

Maureen Ahern, Alan O'Connell, and Debra Lorenzo.

82.     Plaintiffs anticipate that discovery will reveal similarly for other

employees in Massachusetts during the relevant statute of limitations.

83.     Defendants' breach has damaged the plaintiffs and the Massachusetts class

in an amount to be proven at trial.

<u>**Count VI:  Rescission of/Voiding Of Contracts Signed**</u>

84.     Plaintiffs and the class members repeat and reallege the above as if fully

set forth herein.

85.     Any waivers/releases of wage claims that Patmore procured since the

filing of this lawsuit, whether in Massachusetts or nationally, should be rescinded.

86.     Members of the class signed waiver agreements with Defendants as

alleged above and were not fully informed of their rights under the wage laws, and all

relief that they are entitled to under the wage act, and to the extent, after discovery,

members of the class felt coerced in their signing of those agreements, those agreements

should be rescinded when they purport to be in "full settlement" of all wages that must be

due.  Alternatively, those Massachusetts documents should be declared null and void

under the reasoning of <u>Crocker v. Townsend Oil</u> (SJC December 17, 2013) and similar

case law requiring procedural and due process safe guards before the "full settlement" of

any wage claims.

PLAINTIFFS AND THE CLASS MEMBERS HEREBY DEMANDS A TRIAL BY JURY.

WHEREFORE, PLAINTIFFS HEREBY REQUESTS THAT THIS COURT:

1.     Find that plaintiffs Crowe, O'Day, Clarke and Bowen were misclassified and find that similarly situated members of the class were misclassified, both under the FLSA in Count I nationwide and in Massachusetts under Counts III.

2.     Certify the FLSA claims in this case in Counts I for collective action treatment under the FLSA.

3.     Certify the FLSA claims in this case in Count II for collective action treatment under the FLSA.

4.     Certify the Massachusetts claims in Counts III, IV and V for class action treatment under Fed. R. Civ. P. 23.

5.     Appoint Plaintiffs' counsel as class counsel for all claims herein.

6.     Enjoin the Defendants from further communicating with class members about wages that may be due to them and procuring waivers of same without court processes.

7.     Enter judgment in plaintiffs' favor and in favor of the class of persons represented hereby, granting them pay for all hours worked, as well as interest thereon.

8.     Award damages, liquidated and/or treble damages, as

9.     Award plaintiff and the class attorneys' fees and costs of suit.

10.    Rescind or declare null and void any agreements signed by any putative class members.

Respectfully submitted,

PLAINTIFFS, on their own behalf and on behalf of all others similarly situated.

By their counsel,

*/s/ Peter F. Russell*
Peter F. Russell, Esq.
RUSSELL & ASSOCIATES, LLC
200 Highland Avenue, Suite 304
Needham, MA 02494
Dated:  March 2, 2014            (781) 444-5151

## <u>CERTIFICATE OF SERVICE</u>

I, Peter F. Russell, hereby certify that this document is being served by email via the ECF system of the District of Massachusetts on counsel for defendants this 2nd day of March, 2014.

<u>/s/ Peter F. Russell</u>
Peter F. Russell