UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
ANNA MARIA CROWE, ET AL,          )
                                  )
            Plaintiffs,           )
                                  )
                                  )    CIVIL ACTION NO.
        v.                        )    13-10249-DPW
                                  )
EXAMWORKS, INC., ET AL,           )
                                  )
            Defendants.           )
```

MEMORANDUM AND ORDER
September 30, 2015

The plaintiffs here are a group of former and present
employees of the defendants ExamWorks and MES Group, Inc., an
entity that was acquired by ExamWorks in 2012.  They allege that
they were not paid for overtime work in violation of the federal
fair labor standards and Massachusetts wage and hour law.  The
plaintiffs seek to represent a class of former and present
employees of the defendants in Massachusetts.  They now move for
certification of the class, and both parties respectively move
for partial summary judgment on various counts.

## I. BACKGROUND

### A.   *Factual Background*

#### 1.   The Parties

 ExamWorks is a national company with headquarters in

1

Atlanta, Georgia, that provides independent medical examinations ("IMEs"), peer reviews, utilization reviews, and IME-related services.  In 2012, through a stock purchase agreement, ExamWorks purchased substantially all the assets of MES Group, which provided similar services.  ExamWorks now has – as had MES Group previously – an office in Norwood, Massachusetts, where employees perform peer review and utilization review work. Defendant Crystal Patmore served as Vice President of Human Resources at ExamWorks during the relevant time period.

The plaintiffs either work or previously worked for MES and/or ExamWorks in Norwood as Utilization Review Nurse Auditors ("URNAs"), Clinical Quality Assurance Coordinators ("CQACs"), and Clinical Coordinators ("CCs").  Plaintiff Anna Maria Crowe worked as an URNA from March 12, 2012 until June 2013; Plaintiff Joanne Clarke has worked as an URNA from November 2007 and continues to be employed in that capacity with the defendants; and Plaintiff Suzanne O'Rourke Chansky worked as an URNA from October 18, 2010 until August 2012.  Plaintiff Kathleen O'Day worked as a CQAC from March or April 2007 until February 2013, and Plaintiff Diane Bowen worked a CQAC from July 2010 until September 2011.  Plaintiff Tia Finley worked as a CC, but the

summary judgment record does not provide the specific time
period of her employment.[1]

The named plaintiffs in the URNA role – Crowe, Clarke, and
Chansky – all hold bachelor's degrees in nursing and are
registered nurses ("RNs").  In addition, before working for the
defendants, Crowe had over six years of nursing experience;
Clarke had over twenty years of nursing experience in various
capacities, including as a nurse, nurse field supervisor,
patient case manager, and utilization review specialist; and
Chansky had over ten years of nursing experience.

The named plaintiffs in the CQAC role – Bowen and O'Day –
are both RNs with bachelor's degrees in nursing and clinical
experience.  The summary judgment record does not indicate
whether Finley was an RN or what her background is; in any
event, neither Finley nor the CC position is the subject of the
summary judgment motions now before me.

2.   The URNA and CQAC Positions

As a general matter, utilization review "concerns the
quality of care provided to injured employees, including whether
the service is appropriate and effective, the proper costs of
services, and the quality of treatment."  452 Mass. Code Regs.

---

[1] Numerous other named plaintiffs who had previously joined in
this lawsuit have been dismissed.

6.02; *see Clark* v. *Centene Co. of Tex.*, 44 F. Supp. 3d 674, 676
(W.D. Tex. 2014).  In performing utilization review work, the
defendants must comply with requirements promulgated by the
Massachusetts Department of Industrial Accidents ("DIA") and by
URAC (formerly the Utilization Review Accreditation Commission),
through which they are accredited.

**URNAs** – Utilization Review Nurse Auditors – are tasked with
reviewing requests for medical treatment from physicians or
physical therapists for individuals who are eligible for
worker's compensation.  URNAs assess whether a proposed
treatment or diagnostic test is medically necessary based on the
patient's medical records and the applicable medical guidelines
promulgated by various state agencies – in Massachusetts and
other states – or third parties.  Among the essential duties and
responsibilities of the position, as defined by the job
description, are "work[ing] directly with providers to identify
level, intensity and duration of care"; documenting findings and
"evaluat[ing] medical necessity for frequency, intensity and
length of required care"; and ensuring that quality utilization
reviews are "completed within the required client, federal and
state or URAC mandated turnaround times."

After reviewing a patient's medical records – including x-
rays, MRIs, CT scans, lab test results, provider notes, and

prescribed drugs – an URNA must identify the applicable guideline related to the request and determine if the requested treatment is medically necessary under that guideline.  An URNA can either approve the treatment request or refer a treatment request for review by a physician in the same licensure category as the requesting physician.  When approving a request, the URNA prepares a summary paragraph called a guideline application that restates the medical provider's request, restates the provider's basis for making the request, cites to the applicable guideline or the provider's assertion as to why treatment is medically necessary, indicates that approval should be permitted, and states the URNA's rationale for approval.  An URNA's determination – that is, approval or referral for review – is reviewed only for purposes of an audit or performance review; URNAs' determinations are not subject to regular review by a supervisor.

In reaching a determination, URNAs are also guided by the Massachusetts "10% Rule," under which an URNA may approve a proposed treatment for a case that falls outside of the particular guideline where the requesting physician deems the treatment necessary "in light of all circumstances presented by the injured employee and the needs and resources particular to the locality or facility."  452 Mass. Code Regs. 6.06(2).  The

impetus for this rule is the recognition that although the
"Treatment Guidelines are meant to cover the usage of a vast
majority of tests and treatments . . . approximately 10% of
cases will fall outside [the] guidelines and thus require a
review on a case by case basis."[2]

To obtain an URNA position with the defendants, an
individual must have graduated from "an accredited nursing
program" and have a minimum of three to five years of direct
professional patient care.  He or she also must be registered
and licensed as an active registered nurse ("RN"), licensed
practical nurse ("LPN"), or licensed vocational nurse ("LVN"),
and must have "strong knowledge of medical terminology, anatomy
and physiology, treatment protocols, medications and laboratory
values."  Although there is apparently an internal policy under
which LPNs working as URNAs are supervised by RNs in performing
their duties, the plaintiffs contend that LPNs and RNs perform
the same type of work without distinction when functioning as
URNAs.  The parties also dispute whether any third-party or

---

[2] The parties dispute whether the 10% Rule requires URNAs to
approve requests not covered by a specific guideline if the
requesting medical provider states that the treatment is
medically necessary, or whether the 10% Rule enables URNAs to
exercise their discretion on a case-by-case basis.

government agency requirements direct additional supervision of LPNs.[3]

**CQACs** – Clinical Quality Assurance Coordinators – perform two functions.  The first is assignment.  When a case comes in for peer review from an insurance company client, a CQAC assigns the case to a particular peer reviewer, using a database of physicians, and ensures that the case file has the appropriate documentation for the physician's review.  These case files, like those reviewed by URNAs, contain a variety of medical documents, including MRI reports and provider notes.

The second CQAC function is quality assurance.  CQACs ensure that peer review reports and other correspondence or supplemental reviews have been conducted by an appropriate board specialist; that the reviews contain "clear, concise evidence-based rationales . . . in support of all recommendations and/or

---

[3] The defendants contend that the Massachusetts Department of Industrial Accidents ("DIA"), which promulgates regulations governing utilization review by insurers, requires that registered nurses ("RNs") perform URNA work, and that any nurse who is not an RN but performs such work must be supervised by one.  However, as discussed *infra*, the source cited by the defendants does not support this contention.  The plaintiffs observe that the applicable regulations require only that "a practitioner of the same school as the ordering provider" issue "[a]ny adverse determination of a health care service issued by a utilization review agent."  452 Mass. Code Regs. 6.04(5)(c).  This is consistent with the internal process of requiring an URNA to refer a case for physician review rather than denying a request for treatment.

determinations," provider credentials and a signature, and "clinical citations and references when applicable," and that such references "are current and obtained from reputable medical journals and/or publications"; and ensure that "all client instructions and specifications have been followed" and "the content, format, and professional appearance of the reports are of the highest quality," among other tasks.  In short, as the job description states, CQACs are responsible for ensuring that "Peer Review case reports are of the highest quality and integrity and in full compliance with client contractual agreement, regulatory agency standards and/or federal and state mandates."

CQACs employed by the defendants are not required to have any certificates, licenses, or registrations, but they must have at least "two years clinical or related field experience; or equivalent combination of education and experience," and they must have "strong knowledge of medical terminology, anatomy and physiology, medications and laboratory values."

### 3.   Defendants' Reclassification of URNAs and CQACs

At MES, URNAs and CQACs had been classified as "exempt" from the overtime pay requirements imposed by state and federal law.  However, shortly after ExamWorks acquired MES, it reclassified both positions as "non-exempt."  CCs had been

classified as "non-exempt" at MES, and their status did not change at any point in the relevant time period.

The CQACs were reclassified as non-exempt in April 2012 and informed by letter that effective April 16, 2012, they would be paid based on their actual hours worked - and not on the basis of a set bi-weekly amount - and that they would be eligible for overtime compensation.  The URNAs were reclassified as non-exempt in September 2012 and similarly informed by letter that effective September 29, 2012, they would be paid based on their actual hours worked and would be eligible for overtime.  Both letters stated that the change was the result of a review of the job duties "against the Federal Standards Labor Act [*sic*] exemption testing," after which it was determined that the "position and job duties no longer qualify . . . as . . . 'exempt' or 'salaried.'"

Defendant Crystal Patmore was responsible for determining employees' job classifications for purposes of overtime pay.  To make these determinations, Patmore consulted the job duties of each position and referred to the Department of Labor website.  Patmore testified at her deposition that she reclassified the URNAs because they worked "side by side" with the CQACs, and it was easier "to manage all the nurses that way."

4.    Overtime Hours Worked by Plaintiffs

The parties dispute nearly all of the facts regarding plaintiffs' work in excess of forty hours per week during the time period in which the plaintiffs contend they were improperly classified as exempt, and during the time period in which they were classified as non-exempt.  With reference to the period they were designated as non-exempt, the plaintiffs contend that CQACs and URNAs were scheduled for 8.5 hour daily shifts, but the defendants argue that these shifts included a 30-minute, unpaid meal break, as well as two 15-minute paid breaks.  The parties also dispute whether during this period the CQAC and URNA plaintiffs, and other similarly situated employees, worked while they ate lunch, whether they worked beyond their shifts or on the weekend, and whether these activities were either known or encouraged by the supervisors.

It is undisputed that before reclassification, the defendants did not keep time logs of when CQACs and URNAs worked.  After reclassification of the positions as non-exempt, CQACs and URNAs were instructed to keep time logs and to clock in and out for their shifts and for any breaks.  It is generally undisputed that, on at least several occasions, supervisors

10

modified the timecards of these employees.[4]  However, the parties dispute the reasons for these modifications, including whether they were undertaken to produce timecards showing a workweek of forty or fewer hours (with the purpose of avoiding having to pay overtime) or whether they were undertaken to correct legitimate entry errors.

## B.   *Procedural History*

Plaintiff Anna Maria Crowe, on behalf of herself and a putative class, filed this action in Norfolk County Superior Court on January 8, 2013 asserting federal and state claims in four counts.  The defendants removed the case to federal court on the basis of federal question jurisdiction under 28 U.S.C. § 1331.

The third amended complaint, which is the operative complaint here, was filed on behalf of six named plaintiffs: Crowe, O'Day, Clarke, Bowen, Chansky, and Finley.[5]  The complaint

---

[4] Although the defendants assert that the plaintiffs "have failed to establish that any of their time sheets were revised by [Patricia] Troiano," one of the supervisors, and "when those time sheets were allegedly changed," the plaintiffs have submitted with their motion for class certification an audit report of the timecard system demonstrating that the usernames "mbolstad," "ptroiano," "gdolan," and "smahoney" modified timecards of employees, including Plaintiffs Joanne Clarke and Anna Maria Crowe.

[5] After Crowe filed her first amended complaint, the defendants moved to dismiss for failure to state a claim.  Crowe obtained leave to file a second amended complaint that added four named

asserts six counts: (I) violation of the Fair Labor Standards
Act ("FLSA"), 29 U.S.C. §§ 206, 207, by misclassification of the
plaintiffs as exempt from the FLSA overtime pay requirement;
(II) violation of the FLSA by deprivation of overtime pay for
non-exempt employees; (III) violation of the Massachusetts
overtime law, Mass. Gen. Laws ch. 149, § 148, by
misclassification of the plaintiffs as exempt; (IV) violation of
Mass. Gen. Laws ch. 150, §§ 1, 1A, by deprivation of overtime
pay for non-exempt employees; (V) breach of contract through the
failure to pay the plaintiffs for all hours worked and to
provide a meal break; and (VI) rescission or voiding of
contracts signed by plaintiffs waiving their rights under the
wage laws.

The plaintiffs move for partial summary judgment on Counts
I (FLSA misclassification), II (FLSA deprivation of overtime
pay), and IV (Massachusetts deprivation of overtime pay).[6]   The

_____

plaintiffs – Rebecca Lawrie, Kathleen O'Day, Joanne Clarke, and
Nathan Fern – and continued to make allegations on behalf of a
putative class.  Thereafter, the defendants filed a partial
motion to dismiss, and the plaintiffs filed a motion for
conditional certification of a class as to certain counts of the
complaint.  Following a hearing, I directed the filing of a
third amended complaint in order to frame the issues properly,
and denied the pending motion to dismiss and the motion to
certify the class, both without prejudice.
[6] It is unclear why the plaintiffs have not moved for summary
judgment on Count III, which presents factual and legal issues

defendants move for summary judgment on Counts I (FLSA misclassification) and III (Massachusetts misclassification). Neither party moves for summary judgment on Counts V and VI.

The plaintiffs also move for certification of a class of past and present Massachusetts CQAC and URNA employees of the defendants for the purposes of the state law claims raised in Counts III, IV, and V.  To put the questions in context, I first address the summary judgment motions.

## II. MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A.  *Standard of Review*

Summary judgment is appropriate when, based on the pleadings, discovery, and disclosure materials in the record, "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  A "genuine" dispute is one that, based on the supporting evidence, "a reasonable jury could resolve . . . in favor of the non-moving party," and a "material" fact is one that has "the potential to affect the outcome of the suit under the applicable law."  *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted).  I view the facts "in the light most favorable to the non-moving

---

regarding misclassification essentially identical to those presented by Count I.

party." *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st
Cir. 1999).

Where, as here, both parties have moved for summary
judgment, I consider each motion separately to determine whether
summary judgment is warranted for either side. *Bienkowski* v.
*Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (citation
omitted).  Summary judgment is appropriate if "either of the
parties deserves judgment as a matter of law on facts that are
not disputed." *Adria Int'l Group, Inc.* v. *Ferré Dev., Inc.*, 241
F.3d 103, 107 (1st Cir. 2001).  If further "inquiry into the
facts is . . . desirable to clarify the application of the law,"
summary judgment is not appropriate. *Mandel* v. *Bos. Phoenix,
Inc.*, 456 F.3d 198, 205 (1st Cir. 2006) (citation omitted).

## B.  *Plaintiffs' Motion for Summary Judgment*

### 1.   Count I: Misclassification Under FLSA

The FLSA requires that employers compensate employees for
hours worked in excess of 40 per workweek, at a minimum rate of
one and one-half times their regular rate of pay.  29 U.S.C.
§ 207(a)(1).  However, the FLSA exempts from this overtime pay
requirement employees who work "in a bona fide executive,
administrative, or professional capacity." *Id*. § 213(a)(1).
The employer bears the burden of demonstrating that an employee
falls within an FLSA exemption, see *Idaho Sheet Metal Works,*

14

*Inc.* v. *Wirtz*, 383 U.S. 190, 209 (1966), as defined by regulations promulgated by the Secretary of Labor.  *See Reich* v. *Newspapers of New Eng., Inc.*, 44 F.3d 1060, 1070 (1st Cir. 1995).  "Exemptions are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'"  *Id.* (citations omitted).  How an employee spends his or her time at work is a question of fact, but whether the particular activities subject the employee to an exemption from the FLSA overtime requirements is a question of law.  *See Withrow* v. *Sedgwick Claims Mgmt. Serv.*, 841 F. Supp. 2d 972, 975 (S.D.W. Va. 2012) (citations omitted); *Edwards* v. *Audubon Ins. Grp.*, No. 3:02-CV-1618-WS, 2004 WL 3119911, at *4 (S.D. Miss. Aug. 31, 2004) (citing *Icicle Seafoods, Inc.* v. *Worthington*, 475 U.S. 709, 714 (1986)).

The defendants argue that the URNAs are exempt under the learned professional exemption, and that the CQACs are exempt under the learned professional or administrative exemptions.  I consider each in turn.[7]

_____

[7] As an initial argument, the plaintiffs contend that the reclassification decisions issued by the defendants constitute admissions of liability for misclassification, and that summary judgment should be allowed on this Count for this reason alone. I agree with the defendants that these reclassification decisions are not dispositive.  It is well-settled that the

a.  *URNAs: Learned Professional Exemption*

To be considered a "professional" employee under the regulations and therefore exempt from the FLSA overtime requirement, two criteria must be satisfied: the employee must be "(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ; (2) Whose primary duty is the performance of work: (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction . . . ." 29 C.F.R. §§ 541.300, .301.

i.  *Salary Basis & Amount*

An employee is paid on a salary basis "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to

---

nature and duties of the job, rather than the employer's classification of the position, determine whether an exemption applies.  *See* 29 C.F.R. § 541.2; *see also Clarke* v. *JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400(CM)(DCF), 2010 WL 1379778, at *22 (S.D.N.Y. Mar. 26, 2010) ("reclassification is not materially relevant to the determination of whether [plaintiff] falls within the computer employee exemption"); *Reeves* v. *Int'l Tel. & Tel. Corp.*, 357 F. Supp. 295, 302-03 (W.D. La. 1973) ("the exemption of any individual depends upon his duties and other qualifications and not upon how the employer classifies the employee"); *Goldberg* v. *Strickland Transp. Co.*, 203 F. Supp. 417, 419 (E.D. Ark. 1962); *Walling* v. *Moore Milling Co.*, 62 F. Supp. 378, 382 (W.D. Va. 1945).

reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602(a); *see id.* § 541.300(b).  A few types of deductions – such as for absences from work for personal reasons and certain unpaid leaves – are permitted.  *Id.* § 541.602(b).  Otherwise, "an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked."  *Id.* § 541.602(a).

It is undisputed that before reclassification, the named URNA plaintiffs were compensated at a rate higher than $455 per week, regardless of the number of hours they worked or the quality of their work.  This is generally sufficient to satisfy the salary requirement.  *See, e.g.*, *Rieve* v. *Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 862 (C.D. Cal. 2012); *Withrow*, 841 F. Supp. 2d at 976.  However, the plaintiffs contend that the salary basis requirement is not met, because the defendants cannot produce affirmative evidence that there were not or could not be deductions from the plaintiffs' pay based on the quality or quantity of their work.

An employer "lose[s] the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis," as demonstrated by "[a]n actual practice of making

17

improper deductions."  29 C.F.R. § 541.603(a).[8]  The plaintiffs

have not pointed to any specific practice on the part of the

defendants that creates a genuine dispute whether the defendants

had "an 'objective intention to pay its employees on a salaried

basis.'"  *Martinez* v. *Hilton Hotels Corp.*, 930 F. Supp. 2d 508,

521 (S.D.N.Y. 2013) (citation omitted).

Although exemptions are to be construed against employers –

and therefore the defendants bear the burden of demonstrating

that the exemption is satisfied – the plaintiffs must offer

evidentiary materials, not unsubstantiated allegations, to

support their motion for summary judgment.  *See Idaho Sheet*

*Metal Works*, 383 U.S. at 209 (employer bears exemption burden).

---

[8] Under a pre-2004 version of the regulations, an employer could
lose the exemption if it had "an employment policy that creates
a 'significant likelihood' of such deductions." *Auer* v.
*Robbins*, 519 U.S. 452, 461 (1997); *see O'Brien* v. *Town of
Agawam*, 350 F.3d 279, 292 (1st Cir. 2003).  However, following
the 2004 revisions, numerous courts have concluded that this
"significant likelihood" test is no longer in use. *See Baden-
Winterwood* v. *Life Time Fitness, Inc.*, 566 F.3d 618, 627-28 (6th
Cir. 2009); *Kaiser* v. *At the Beach, Inc.*, No. 08-CV-586-TCK-FHM,
2011 WL 6826577, at *14 (N.D. Okla. Dec. 28, 2011).  *But see
Martinez* v. *Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 521-22
(S.D.N.Y. 2013) (reciting significant likelihood test and citing
cases recognizing it).  An actual practice of improper salary
deductions is generally required for an employer to lose the
exemption under the salary requirement. *See Kaiser*, 2011 WL
6826577, at *14-15.  Nevertheless, "[i]f an employer has a
clearly communicated policy that prohibits the improper pay
deductions" and provides mechanisms for correction of such
deductions, the exemption may still be available. 29 C.F.R.
§ 541.603(d).

*See generally Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient").   The plaintiffs' assertions of improper deductions prior to reclassification are merely hypothetical and are inadequate to create a genuine dispute.   *See Medina-Munoz* v. *R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).   There are no grounds in the record before me on which a reasonable fact finder could conclude that the salary basis requirement was not satisfied for the time period prior to reclassification.[9]   *Cf. Davis* v. *Lenox Hill Hosp.*, No. 03 Civ.3746 DLC, 2004 WL 1926087, at *4 (S.D.N.Y. Aug. 31, 2004) (salary element not satisfied at

---

[9] The plaintiffs also contend that they must be considered non-exempt after reclassification because they were not paid on a salary basis at that time.   It goes without saying that the defendants cannot satisfy the salary basis requirement post-reclassification.   The reclassification letter sent to the URNAs explicitly states that the employees were reclassified as "hourly," meaning that they would "be paid based on . . . actual hours worked and not a set bi-weekly amount."   Regardless of whether the defendants' reclassification decisions were proper, these letters reflect a clear intention on the part of the defendants *not* to pay the plaintiffs on a salary basis, but rather on an hourly basis.   *See* 29 C.F.R. §§ 541.602(a), 541.603(a); *see also Kennedy* v. *Commonwealth Edison Co.*, 410 F.3d 365, 372 (7th Cir. 2005); *Martinez* v. *Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 521 (S.D.N.Y. 2013).

   The plaintiffs' other arguments on deprivation of overtime pay and improper deductions during this period are not relevant to Count I.   They are, of course, central to the claims of Count II.

summary judgment because both parties submitted evidentiary

material "rais[ing] questions of fact as to whether [plaintiffs

and other RNs] were paid on an hourly basis").

     *ii.  Primary Duty Requirement*

The primary duty requirement contains three elements, all

of which must be satisfied for the learned professional

exemption to apply: "(1) The employee must perform work

requiring advanced knowledge; (2) The advanced knowledge must be

in a field of science or learning; and (3) The advanced

knowledge must be customarily acquired by a prolonged course of

specialized intellectual instruction."  29 C.F.R. § 541.301(a).

As a threshold matter, the parties make much of language in

the regulations discussing the status of RNs and LPNs under the

primary duty test.  The regulations provide that "[r]egistered

nurses who are registered by the appropriate State examining

board generally meet the duties requirements for the learned

professional exemption," but "[l]icensed practical nurses and

other similar health care employees . . . generally do not

qualify as exempt learned professionals because possession of a

specialized advanced academic degree is not a standard

prerequisite for entry into such occupations."  29 C.F.R.

§ 541.301(e)(2).  The defendants contend that because all of the

named URNA plaintiffs are RNs, they should be presumptively

exempt.  The plaintiffs, for their part, argue first that the work URNAs perform is qualitatively different from the work RNs perform in clinical settings, and second, that because LPNs have served (and do currently serve) as URNAs, URNAs should be presumptively non-exempt, because the exemptions must contemplate the minimum requirements of the job.

That the named plaintiffs are RNs and that LPNs also serve as URNAs are relevant facts to the inquiry; but those facts do not end it.  Instead, the regulations require a careful review of the job duties and responsibilities to determine whether the "primary duty" test is satisfied.  29 C.F.R. § 541.2; *see Rieve*, 870 F. Supp. 2d at 863 ("the fact that Plaintiff holds an RN degree is not dispositive, nor is a conclusory statement from Plaintiff's deposition that she relied upon her RN training"; instead, "[a]n inquiry of whether Plaintiff's work required advanced knowledge necessitates a thorough examination of the tasks comprising Plaintiff's primary duties" (citing *Powell* v. *Am. Red Cross*, 518 F. Supp. 2d 24, 39 (D.D.C. 2007))); *see also Withrow*, 841 F. Supp. 2d at 987.

*Prong 1: Work Requiring Advanced Knowledge*

The regulations define "work requiring advanced knowledge" as "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of

discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work.  An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances."  29 C.F.R. § 541.301(b).  Although "[t]he nature of 'discretion and judgment' in the context of the professional exemption does not receive further elaboration in the regulations," *Pippins* v. *KPMG, LLP*, 759 F.3d 235, 240 (2nd Cir. 2014), the First Circuit has employed the administrative exemption's definition of "discretion and independent judgment" to the same phrase in the learned professional exemption on at least one occasion.  *See De Jesus-Rentas* v. *Baxter Pharm. Servs. Corp.*, 400 F.3d 72, 74 & n.4 (1st Cir. 2005).  *But see Pippins*, 759 F.3d at 240-41 (collecting cases and identifying sufficient distinctions between exemptions to conclude that guidance under administrative exemption for "discretion and independent judgment" is not instructive for similar phrase in learned professional exemption).  Accordingly, to the extent it provides some guidance, I will rely on the definition of "discretion and judgment" provided for the administrative exemption, *see* 29 C.F.R. § 541.202, recognizing that the Secretary of Labor has noted that the phrase imposes a "less stringent" standard in the

context of the learned professional exemption. *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, the Preamble to the 2004 Final Rule*, 69 Fed. Reg. 22,122, 22,151 (Apr. 23, 2004) [hereinafter *Defining Exemptions*].[10]

I begin with a review of the URNAs' duties. Although the parties characterize the responsibilities differently, there is no meaningful dispute regarding the substance of the URNAs' tasks. *Cf. Rieve*, 870 F. Supp. 2d at 860; *Powell*, 518 F. Supp. 2d at 40. The URNAs' primary duties entail identifying an applicable guideline for a given request for medical treatment, reviewing the medical records within the case file in relation to the guideline to determine if the guideline is met, deciding whether to approve the request or refer it for a physician's review based on this assessment, and then writing a summary statement using a template that includes a stated rationale for the determination (either approval or referral for review of the treatment). The URNAs consider a variety of medical records and circumstances, including a patient's diagnosis, treatment, and

---

[10] In making this observation, the Secretary of Labor cited for support the lower court's decision in *De Jesus-Rentas* v. *Baxter Pharmacy Services Corp*. *See Defining Exemptions*, 69 Fed. Reg. at 22151 (citing *De Jesus-Rentas* v. *Baxter Pharm. Servs. Corp.*, 286 F. Supp. 2d 235, 241 (D.P.R. 2003)).

prescribed drugs, in comparing the patient's circumstances and the requested treatment to the applicable guideline.  In conducting their duties, they operate with minimal supervision.

The plaintiffs contend that the URNA job consists exclusively of routine application of guidelines to medical files and does not require any advanced knowledge or the exercise of judgment and discretion because the result is dictated by the guidelines in every instance.  The defendants, by contrast, argue that the job requires URNAs to apply their medical knowledge in assessing, on a case-by-case basis, whether under the applicable guidelines, the requested medical treatment or procedure is medically necessary.  The summary judgment record supports the defendants' interpretation of the URNA duties.  The URNA plaintiffs employ advanced, technical knowledge in the medical field to exercise independent judgment in determining whether a particular treatment request for a particular patient satisfied the applicable guidelines.

An excerpt from Clarke's testimony demonstrates the way in which URNAs apply their medical knowledge to reviewing case files and applying guidelines.  When she received a request for a physical therapy evaluation from a physician, Clarke would look for the following in the case file:

24

> I would expect to see a diagnosis.  We already get the
> date of injury from the adjuster, and that is the most
> accurate date of injury.  We would expect to see –
> okay, he has decreased range of motion, say, in his
> lumbar spine.  He has muscle spasm in that area.
> Let's see.  Possibly they've already done an x-ray or
> an MRI.  Are there any herniated disks?  Whatever. It
> depends upon the timeframe also for that.

If a request was unclear, Clarke would "either send out a request for additional information or pick up the phone" and call the provider's office, a task that others confirmed the URNAs perform.  The resulting review is dictated by the information provided in the file and collected through the follow-up, and by the guidelines.

The case law supports the conclusion that individuals engaged in initial utilization review work must use advanced knowledge and discretion to complete this work.  In *Withrow*, 841 F. Supp. 2d at 986-87, Judge Goodwin determined that a utilization review nurse who was an RN "used her advanced knowledge to consistently exercise judgment in determining whether a treatment requested by a claimant was related to the compensable injury" and "used her discretion to decide whether a particular request required an independent medical evaluation." In that case, the plaintiff had eventually taken on additional duties as a telephonic case manager, through which she interacted with patients returning to work and communicated

directly with employers regarding workplace accommodations for patients. *Id.* In this capacity, her "medical knowledge enabled her to examine claimants' conditions and provide advice on what to expect from treatments." *Id.* Although the opinion does not say so explicitly, it suggests that the plaintiff's duties as a utilization review nurse alone would be sufficient to satisfy the learned professional exemption. *Id.; see Rieve*, 870 F. Supp. 2d at 864 (interpreting *Withrow* as finding plaintiff's duties as a utilization review nurse and her later duties as a case manager exempt).

Similarly, in *Rieve*, 870 F. Supp. 2d at 860, a field case manager provided day-to-day case management services for employers and workers' compensation insurers, including monitoring whether patients were receiving care consistent with medical orders, documenting the costs of care, implementing the ordered medical services, and assessing whether the medical care that was being provided was appropriate. The plaintiff was guided by a manual in completing her duties and did not have the authority to modify treatment, but it was within her duties to identify unnecessary procedures and treatments. *Id.* She reported that she spent more than fifty percent of her time communicating with doctors, patients, and claims adjustors in fulfilling her duties. *Id.* at 860, 863. Judge Carter concluded

26

that the plaintiff's primary duties placed her in a similar
position to that of a registered nurse, "such that Plaintiff
should be afforded the same treatment under the law as
registered nurses engaged in the practice of nursing." *Id.* at
863, 865.   Among the parallels Judge Carter identified between
the duties of registered nurses and those of the plaintiff were
prioritizing patient health, "act[ing] as an intermediary
between the patients and doctors and provid[ing] advice to
patients." *Id.*   In addition, the plaintiff "deal[t] with
extremely individualized results – a care plan for each of her
patients," and even when following a manual, "her decisions are
fact-specific and tailored to each of her patient's individual
situations." *Id.* at 865; *see id.* at 864 (reasoning that in both
*Rieve* and *Withrow*, plaintiffs "utilized independent judgment and
discretion in [their] duties of the type intended to be exempt
from FLSA coverage").

Finally, in *Powell*, 518 F. Supp. 2d at 27-28,[11] a registered
nurse serving as a wellness associate for the American Red Cross
"collected and reviewed medical records for individuals being
deployed to determine whether the individual met the medical

---

[11] Although the plaintiff in *Powell* brought her claim under the
D.C. Wage and Hour Law, the exemptions under that law and the
FLSA are the same.  *Powell* v. *Am. Red Cross*, 518 F. Supp. 2d 24,
37 & n.13 (D.D.C. 2007).

requirements for deployment under the applicable military guidelines," briefed and debriefed deployed personnel, and performed a range of additional tasks relating to the physical well-being and health of Red Cross employees on-site.  Judge Huvelle concluded that "based on the technical, medical nature of both the records and the guidelines involved," the "plaintiff used her advanced knowledge as a registered nurse in making these important determinations" during medical record review whether "an individual was deployable from a medical standpoint."  *Id.* at 40-41.  The plaintiff also exercised discretion and judgment in "requesting additional testing when necessary to evaluate an employee's medical condition and advising employees how to address health issues so as to ensure that they would be deployable."  *Id.*

In *Withrow*, *Rieve*, and *Powell*, the plaintiffs had additional duties that informed the courts' ultimate decisions. However, in each case, the plaintiff performed medical review work substantially similar to that performed by the URNAs, and in each case the judge's reasoning suggested that the application of medical knowledge and discretion in performing these tasks alone was sufficient to satisfy the first prong of the duties test.  *See Rieve*, 870 F. Supp. 2d at 864 ("Plaintiff did not merely input routine data but engaged in activities that

28

demonstrate she is a skilled health care professional.");
*Withrow*, 841 F. Supp. 2d at 987 ("As a utilization review nurse,
[plaintiff] used her advanced knowledge to consistently exercise
judgment in determining whether a treatment requested by a
claimant was related to the compensable injury."); *Powell*, 518
F. Supp. 2d at 40-41 ("plaintiff used her advanced knowledge as
a registered nurse" in making individualized determinations of
medical eligibility for deployment). These cases support the
conclusion that the first prong is satisfied here.

None of the limitations the URNA plaintiffs identify
require a different result. For example, the plaintiffs argue
that it is the applicable guidelines that determine whether the
requested treatment is medically necessary, not the URNAs
themselves. This argument collapses an important distinction
between the rule and the person who applies it. It is analogous
to saying that the law decides what the outcome of a case should
be, and therefore judges cannot be said to have discretion in
applying the law to particular cases. But lawyers and judges
are tasked with interpreting the law, assessing its application
on a case-by-case basis, and reaching individualized
determinations. The process in which URNAs engage is not
different in kind. *Cf*. *Rieve*, 870 F. Supp. 2d at 865 ("Even if
Plaintiff follows the same routine for each patient based on the

. . . Manual . . . her decisions are fact-specific and tailored to each of her patient's individual situations."); *Powell*, 518 F. Supp. 2d at 41 ("reliance on . . . guidelines does not, by itself, indicate the lack of professional discretion and judgment" (citation omitted)).  Indeed, "[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption."  29 C.F.R. § 541.704. In contrast, "employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances" are not exempt. *Id.*

I have reviewed the Massachusetts Treatment Guidelines – one of the sets of guidelines the URNAs apply – and am satisfied that they require the plaintiffs to make judgments using their medical knowledge to determine whether a particular treatment is medically necessary.[12]  *Cf. Powell*, 518 F. Supp. 2d at 41-42. Even leaving aside the 10% Rule, whose provision of discretion

---

[12] Several of the Guidelines indicate that they are "not intended to be a substitute for appropriate medical judgment."

30

to URNAs the parties dispute,[13] the Guidelines entrust both
health care providers and those engaged in utilization review
with "taking into account that appropriate care may vary on a
case by case basis."  452 Mass. Code Regs. 6.06(2).  Indeed, the
Massachusetts Office of Health Policy emphasizes in its guidance
on the Guidelines that it provides "guidelines, not mandates,"
and that it is up to the URNA to provide "the clinical rationale
to support the determination."  *See* 452 Mass. Code Regs.
6.04(5).

---

[13] The Guidelines explicitly recognize that approximately ten
percent of cases will fall outside of the Guidelines and require
review on a case-by-case basis.  Under this 10% Rule, "[i]f the
treatment/procedure requested is not allowed under the
[Massachusetts Treatment Guidelines], but the
treatment/procedure is appropriate and medically necessary based
on objective clinical findings, the [URNA] may approve the
request."  The plaintiffs contend, however, that this
determination of medical necessity is made by the referring
physician and indicated in the case file the URNA receives,
signaling to the URNA that he or she must approve the request
without any exercise of discretion.  Although the guidance
offered by the Massachusetts Office of Health Policy suggests
that these discretionary determinations are entrusted to URNAs,
the regulations themselves do speak in terms of the referring
physicians.  *See* 452 Mass. Code Regs. 6.06(2) ("The ultimate
judgment regarding any specific procedure or treatment must be
made by the provider in light of all circumstances presented by
the injured employee and the needs and resources particular to
the locality or facility.").  Even if the discretion is with the
provider, however, the URNA still plays a role in evaluating his
or her clinical findings.  In any event, I need not fully
explore the question of discretion and independent judgment
under the 10% Rule here, because I find discretion and
independent judgment demonstrated as a matter of law on the
basis of the entire record.

That the URNAs cannot deny a request for treatment –
another limitation emphasized by the URNA plaintiffs – is also
not dispositive.  The URNAs have two choices: they may approve
the request or refer it for peer review by a physician in the
same specialty.  This determination to approve or refer for
further review requires an exercise of discretion and judgment.
That the ultimate decision-making authority is held by someone
else does not strip the plaintiffs of using their own judgment
to issue a recommendation.  Indeed, "[t]he decisions made as a
result of the exercise of discretion and independent judgment
may consist of recommendations for action rather than the actual
taking of action."  *See* 29 C.F.R. § 541.202(c) ("employees can
exercise discretion and independent judgment even if their
decisions or recommendations are reviewed at a higher
level. . . . The fact that an employee's decision may be subject
to review and that upon occasion the decisions are revised or
reversed after review does not mean that the employee is not
exercising discretion and independent judgment.").  For this
reason, other courts have similarly given little weight to the
fact that the universe of a plaintiff's possible decisions is
limited to recommending modification or cancellation of
treatment, if the plaintiff uses advanced knowledge and
discretion in preparing the recommendation.  *See, e.g., Rieve*,

870 F. Supp. 2d at 860, 864; *Powell*, 518 F. Supp. 2d at 41.  I conclude that this prong is satisfied.

*Prongs 2 and 3: Advanced Knowledge in a Field of Science or Learning Acquired Through Prolonged, Specialized Instruction*

The parties do not seem to dispute that if advanced knowledge is required for the URNA job, it is in a field of science or learning, as the term is defined by the regulations. *See* 29 C.F.R. § 541.301(c) ("'field of science or learning' includes the traditional professions of . . . medicine, . . . various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status").

They do, however, dispute whether the advanced knowledge required for the URNA position is of the type "customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.301(a)(3).[14]  To determine whether this prong is satisfied, courts look to the qualifications

_____

[14] The term "customarily" is meant to capture "employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction." 29 C.F.R. § 541.301(d).  This includes, for example, "the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry." *Id.*  Where, however, most employees in the occupation "have acquired their skill by experience rather than by advanced specialized intellectual instruction," the exemption does not apply.  *Id.*

33

required by the job rather than the education or credentials of
the particular plaintiff employee. *See Dybach* v. *State of Fla.
Dep't of Corrs.*, 942 F.2d 1562, 1565 (11th Cir. 1991) ("[T]he
determinative factor is the job requirement and not the
education in fact acquired by the employee."); *Mudgett* v. *Univ.
of Pittsburgh Med. Ctr.*, Civ. Action No. 09-254, 2010 WL
1838413, at *5 & n.5 (W.D. Pa. May 6, 2010) ("Although a job
description is not dispositive of the question regarding
professional status . . . the qualifications, duties and
responsibilities set out by the employer" are central to the
determination whether the advanced knowledge necessary for the
job must be "acquired by prolonged specialized instruction and
study" (citation omitted)).

To obtain a job as an URNA, an individual must have
graduated from an "accredited nursing program" and have a
minimum of three to five years of clinical experience.  He or
she must also be licensed as an RN, LPN, or LVN.  In this case,
all of the URNA plaintiffs hold bachelor's degrees in nursing
and RN licenses.  If URNAs were *required* to have the plaintiffs'
credentials, then this prong surely would be satisfied.  *See
Rieve*, 870 F. Supp. 2d at 862 (advanced knowledge RN possesses
is "acquired by a prolonged course of specialized intellectual
instruction"); *Mudgett*, 2010 WL 1838413, at *4-5 (job requiring

34

"satisfactor[y] complet[ion] [of] formal training in an accredited professional school of nursing" and "minimum of three years nursing experience," along with preference for those holding a bachelor of science degree in nursing, satisfied professional exemption); *Powell*, 518 F. Supp. 2d at 39 (noting absence of cases finding that a registered nurse does not satisfy duty test); *see also* 29 C.F.R. § 541.301(e)(2) ("Registered nurses . . . generally meet the duties requirements . . . .").

However, I must look at the minimum requirements of the job to determine whether a course of prolonged instruction is needed to acquire the advanced knowledge that is required. *See Clark*, 44 F. Supp. 3d at 679, 681 (focusing on "the minimum requirements for the job," because "[e]ven though many Plaintiffs are RNs and hold advanced degrees and certificates, the . . . job does not *require* those advanced qualifications"). As the plaintiffs emphasize, LPNs may also serve as URNAs. Although the defendants submit an internal policy indicating that LPNs are subject to more supervision than RNs in the same capacity, this argument does not change the fact that LPNs are permitted to work as URNAs, and at least one LPN did so during

the relevant time period.[15]  Geraldine Dolan, the director of
operations for utilization management and the URNAs' supervisor,
testified that LPNs working as URNAs had a different amount of
supervision because of state requirements, and that for this
reason the preference was to hire RNs over LPNs, but she also
indicated that LPNs and RNs working as URNAs did not have
different job duties.  Standing alone, the minimum requirements
of being an LPN and having three to five years of clinical
experience would not be enough to satisfy this prong.  *See* 29
C.F.R. § 541.301(e)(2) (LPNs "and other similar health care
employees . . . generally do not qualify as exempt learned
professionals because possession of a specialized advanced
degree is not a standard prerequisite for entry into such

---

[15] To the extent the defendants argue that Massachusetts
regulations require URNAs to be RNs or supervised by RNs, the
defendants have not directed me to any specific provision that
states as much.  I find no such requirement in 452 Mass. Code
Regs. 6.01 *et seq.*, which are the primary regulations governing
utilization review.  To the contrary, the regulations suggest
that both RNs and LPNs may make utilization review
determinations.  *See* 452 Mass. Code Regs. 6.04(3)(c)
(utilization review programs must submit "copies of all current
professional licenses issued by the appropriate state licensing
agency for all practitioners rendering utilization review
determinations"); 452 Mass. Code Regs. 6.02 (defining
"practitioner" as "any person who is licensed to practice under
the laws of the jurisdiction within which such health care
services are rendered including physicians . . . and other
licensed medical personnel"); *see also* Mass. Gen. Laws ch. 112,
§§ 74, 74A (setting forth requirements for license to practice
nursing as RN or LPN in Massachusetts).

occupations"); *see also Clark*, 44 F. Supp. 3d at 679  (where minimum requirements for job were LVN or LPN license and two or three years of practical experience, third duties prong not satisfied, because LVNs and LPNs do not generally require "a specialized advanced academic degree" and are presumptively non-exempt).

The requirement of graduation from an accredited nursing program introduces a vital wrinkle.  Neither party has offered a definition of "accredited nursing program" or explained whether graduation from such a program is a credential that exceeds that already held by an LPN or LVN, such that it requires URNAs to have completed a "prolonged course of specialized intellectual instruction" that they would not have as an LPN or LVN alone.

If the accredited nursing program – as contemplated by the URNA job description – provides skills-based practical training for LPNs, but nothing more, then it is unlikely that it would rise to the level of the prolonged academic study contemplated by the regulations.  This reading would be consistent with an understanding of the other educational requirements in the URNA job description – a high school diploma or the equivalent, with a preference for, but no requirement of, a bachelor's degree – as representing the highest required educational attainment.

*See* 29 C.F.R. § 541.301(b) ("[a]dvanced knowledge cannot be attained at the high school level").

If, however, the accredited nursing program offers something more – for example, an effective alternative to earning a bachelor's degree that provides a comparably formal, academic experience – it would likely constitute "advanced intellectual instruction" that would satisfy this prong of the duty test.  *See* 29 C.F.R. § 541.301(d).  Such a requirement would not be inconsistent with the other educational requirements for the job, but would merely impose an additional, further qualification.

This distinction is determinative for the URNAs, but it cannot be made on this record.  *See* 29 C.F.R. § 541.301(d) (regulations "restrict[ ] the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession").  With a more fully developed record that defines the nature of the accredited nursing program whose completion is required for the URNA position, the question whether the job requires prolonged, specialized instruction could possibly be resolved as a matter of law.  But the present record does not permit a resolution either way.

Accordingly, neither party has satisfied its evidentiary burden on the URNA position's exemption status; and I will deny

38

summary judgment for both parties on Count I as to the URNA
plaintiffs' claims.

> b.   *CQACs: Learned Professional Exemption*

I pass for the moment addressing the salary element or
elaborating on the duties of the CQAC position, because it is
clear on its face that the CQAC position cannot satisfy the
third prong of the primary duty requirement for the learned
professional exemption that the position require "advanced
knowledge . . . customarily acquired by a prolonged course of
specialized intellectual instruction."  29 C.F.R. § 541.301(a).
As noted above, even though all of the CQAC plaintiffs are RNs,
the relevant inquiry is what qualifications the position
requires, and the relevant measure is the minimum criteria.  *See*
*Clarke*, 44 F. Supp. 3d at 679, 681.  The required qualifications
for the CQAC position are not as extensive as those for the URNA
position.  CQACs need only have a high school diploma or the
equivalent, at least two years of clinical or related field
experience, or an equivalent combination of education and
experience.  The regulations make clear that a high school
diploma and advanced knowledge that can be obtained through
practical/occupational experience are not enough to satisfy this
prong.  *See* 29 C.F.R. § 541.301(d).  Where "a specialized
advanced academic degree is not a standard prerequisite for

39

entry into [the] occupation[ ]," 29 C.F.R. § 541.301(e)(2), the
professional exemption cannot apply.  *See, e.g.*, *Hashop* v.
*Rockwell Space Operations Co.*, 867 F. Supp. 1287, 1296 (S.D.
Tex. 1994) ("broadcast journalists are not 'professionals' for
FLSA purposes because the study of journalism is not required to
become a competent journalist," even if plaintiff holds college
degree in journalism (citing *Freeman* v. *Nat'l Broad. Co.*, 846 F.
Supp. 1109, 1154-55 (S.D.N.Y. 1993)); *Defining Exemptions*, 69
Fed. Reg. at 22,153-54 (paralegals are generally non-exempt
because "a four-year specialized paralegal degree is [not] a
standard prerequisite for entry into the occupation," even
though "many paralegals possess a Bachelor's degree").

    Here, by the terms of the job description, the CQAC
position does not require a specialized advanced academic
degree.  The defendants do not argue that, in practice, they
impose greater qualification requirements on CQACs than the job
description provides.  To the contrary, Patricia Troiano, a CQAC
supervisor, testified that CQACs need not have a nursing
license, and that even though many of the CQACs were RNs, not
all of them were nurses.  In addition Michelle Bolstad,
Troiano's supervisor, testified that among the CQACs were a
radiation therapist, an EMT, and a "manager" with industry
experience.  When hiring CQACs, Troiano and Bolstad looked for

"clinical knowledge," that is, clinical or medical experience.
Although licensure was valuable, it was not necessary.
Accordingly, the CQAC plaintiffs are not eligible for the
learned professional exemption.

   c.   *CQACs: Administrative Exemption*

   The defendants argue in the alternative that the CQAC
position satisfies the administrative exemption.  To qualify as
an "administrative" employee, the employee must be "(1)
Compensated on a salary or fee basis at a rate of not less than
$455 per week . . . ; (2) Whose primary duty is the performance
of office or non-manual work directly related to the management
or general business operations of the employer or the employer's
customers; and (3) Whose primary duty includes the exercise of
discretion and independent judgment with respect to matters of
significance."  29 C.F.R. § 541.200.

   i.   *Salary Basis & Amount*

   As with the URNA plaintiffs, it is undisputed that before
reclassification, the named CQAC plaintiffs were compensated at
a rate higher than $455 per week, regardless of the number of
hours they worked or the quality of their work.  As discussed
above, the plaintiffs' argument regarding the defendants' burden
on this prong is unpersuasive.  The plaintiffs have not
presented any evidence on which a reasonable fact finder could

conclude that the salary basis requirement was not satisfied prior to reclassification.

Following reclassification, however, the salary basis requirement is not met.  As I noted *infra* at note 9, the reclassification letter sent to the CQACs explicitly states that the employees were reclassified as "hourly," meaning that they would "be paid based on . . . actual hours worked and not a set bi-weekly amount."  *Cf. Kennedy* v. *Commonwealth Edison Co.*, 410 F.3d 365, 370 (7th Cir. 2005) (plaintiffs were "identified as 'salaried' on [defendant's] payroll and receive[d] salaried employee benefits," and accordingly were paid on salary basis). Regardless of whether the defendants' reclassification decisions were proper, these letters reflect a clear intention on the part of the defendants to pay the CQACs on an hourly basis rather than a salary basis.  The intention of the employer is a critical factor.  *See* 29 C.F.R. §§ 541.602(a), 541.603(a); *see also Kennedy*, 410 F.3d at 372 ("the employer may take advantage of the regulation only if it objectively intended to pay its employees on a salary basis"); *Martinez*, 930 F. Supp. 2d at 521 ("The overarching inquiry is whether the employer's practices reflect an 'objective intention to pay its employees on a salaried basis.'" (citation omitted)).  Clearly, the defendants did not intend to pay the CQACs "a predetermined amount . . .

42

not subject to reduction because of variations in the . . .

quantity of the work performed."[16]   29 C.F.R. § 541.602(2); *see*

*McBride* v. *Peak Wellness Ctr., Inc.*, 688 F.3d 698, 705 (10th

Cir. 2012) ("exempt employees are not paid by the hour").

Accordingly, if CQACs are exempt under the administrative

exemption, they may be considered exempt only for the time

period prior to reclassification.

      *ii.  Primary Duty Requirement*

Although the parties dispute the primary duties of the

CQACs, here again the dispute is one of characterization rather

than one of fact.  The CQAC position consists of two

responsibilities: assignment and quality assurance.  Assignment

entails reviewing a medical file and assigning a physician

reviewer based on the particular medical issue.  Quality

assurance involves reviewing a report from a physician reviewer

before sending it back to the insurer.  The job description

states that CQACs ensure that "Peer Review case reports are of

the highest quality and integrity and in full compliance" with

---

[16] The mere fact that the defendants required the CQACs to clock
in and out after reclassification would not, standing alone, be
enough to establish a lack of salary basis for the position if
there were other indicators that the defendants intended to pay
the CQACs on a salary basis.  *Cf. Kennedy*, 410 F.3d at 370-71.
However, the record suggests that the purpose of the timesheets
here was to track how many hours the CQACs were working in order
to determine their compensation.

what the clients expect and what the applicable regulations
require.  Bowen, one of the CQAC plaintiffs, confirmed that the
job description accurately reflects her actual duties.  *Cf.*
*McGowen* v. *Four Directions Dev. Corp.*, No. 1:12-CV-00109-JAW,
2014 WL 916366, at *18 (D. Me. Mar. 10, 2014) (finding
persuasive plaintiff's acknowledgment that job description was
accurate summary of duties).

The quality assurance duties are explained more fully
through the testimony of the CQAC plaintiffs and their
supervisors.  O'Day, one of the CQAC plaintiffs, testified that
she would review the report from the reviewing physician to
"make sure it answered the questions, was in the proper format,
was grammatically correct, and had all of the information it
needed in it, and then . . . would send it back to the insurance
company."  Bowen testified that she would "inspect [the report]
from a clinical perspective for accuracy medically, as well as
grammar, etc., and then send the report back to the insurance
company."  In her review, she would ensure that the reviewing
physician "answered the question, that he answered the right
question, that he answered all the questions, that he took
advantage of the medicals he was given"; that he called the
right provider and asked the right questions; that his rationale
was supported by the guidelines; and "that his answer . . .

44

actually supports an approval" or "that he has a clear determination of denial."  If Bowen did not think the report was medically sound, she "would contact the doctor, ask him questions, if necessary send it back to him to review again, [and] make sure that he answered the question correctly." Troiano, a CQAC supervisor, and Michelle Bolstad, Troiano's supervisor, provided similar descriptions of the quality assurance work, adding that the CQACs would make phone calls if necessary to confirm the accuracy of a report and that the review "is clinical in that these are medical records so you need somebody that can recognize when something doesn't make sense."

*First Duty Requirement: Directly Related to Management or General Business Operations*

The defendants concede that the assignment duties of the CQACs are clerical and mechanical in nature, and therefore cannot be considered exempt.  *See, e.g.*, 29 C.F.R. § 541.202(e). I agree with the parties that these duties could not satisfy the exemption.  The defendants argue instead that quality assurance was the CQACs' primary duty, and this is the duty on which the exemption inquiry should focus.

The amount of time spent performing exempt work is "a useful guide in determining whether exempt work is the primary

45

duty of an employee. . . . [E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," but even those who do not spend half their time on exempt activities can still satisfy the duty test under the right circumstances.  29 C.F.R. § 541.700(b); *see Withrow*, 841 F. Supp. 2d at 985.  Consistent with this general – albeit not determinative – threshold, Bowen testified that she spent fifty percent of her time on some days and one hundred percent of her time on other days doing quality assurance work.  The other factors articulated in the regulations also suggest that quality assurance work was primary for the CQACs.  29 C.F.R. § 541.700(a).  For example, the quality assurance duties are of greater "relative importance" than the assignment duties, and the job title itself contains the term "quality assurance."  *See id.*  (factors to consider include "the relative importance of the exempt duties as compared with other types of duties," and "the character of the employee's job as a whole").  Accordingly, I conclude that if the quality assurance work the CQACs perform may properly be considered exempt, the CQAC position overall satisfies the administrative exemption.

Under the regulations, "[d]irectly related to management or general business operations" means that the type of work the

46

employee performs is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  The plaintiffs argue that the quality assurance work the CQACs perform constitutes non-exempt production activity related to product generation – as opposed to administrative work – because they produce reports that are transmitted between insurers and reviewing physicians.  Although this position finds some support in the case law, it is ultimately unpersuasive on the record before me.

The plaintiffs rely on the First Circuit's decision in *Reich* v. *John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997).  In *Reich*, the First Circuit observed that "non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Id.*  For example, police investigators produce criminal investigations, and the producers and editors of television stations produce newscasts, and therefore are non-exempt because they are production employees. *Id.*  In contrast, marketing representatives at a company that sells insurance policies are not production employees, because

47

they are not "involved in the design or generation of insurance policies, the very product 'that the enterprise exists to produce and market.'" *Id.* (citation omitted). In subsequent cases, the First Circuit has applied *John Alden* to conclude that customer relations representatives and salespeople who manage client relationships are not production employees. *See Hines* v. *State Room, Inc.*, 665 F.3d 235, 242-43 (1st Cir. 2011); *Cash* v. *Cycle Craft Co.*, 508 F.3d 680, 681, 685-86 (1st Cir. 2007). Other circuits have similarly recognized that production jobs are not limited to those producing tangible goods and have focused on the distinction between "production [and] administrative functions" regardless of the nature of the ultimate product in assessing whether a job is exempt. *See, e.g.*, *Davis* v. *J.P. Morgan Chase & Co.*, 587 F.3d 529, 532-33 (2d Cir. 2009).

The plaintiffs here argue that the products the defendants offer are peer review and utilization review – precisely the type of reports the CQACs are tasked with reviewing and distributing. At least one court has reached a similar conclusion on similar facts. In *Clark*, 44 F. Supp. 3d at 682, Judge Sparks concluded that case managers who were all nurses performing utilization review had jobs that were "more 'production' than 'administration.'" The plaintiffs' employer

48

was in the business of "administering government sponsored health insurance plans," and the plaintiffs were "uniquely positioned to 'produce' [the defendant's] 'product' – in this case, the service of administering Medicaid claims." *Id.* at 682-83.  Judge Sparks reasoned that if the plaintiffs were administrative employees, everyone employed by the defendant would also be.  *Id.*  Because the plaintiffs performed "a core functionality of [the defendant's] business model" that was "essentially unique to [the defendant's] niche industry," they must be considered production employees and therefore not exempt under the administrative exemption.  *Id.* at 682.  If the plaintiffs had performed "general administrative work applicable to the running of any business," by contrast, they would be exempt.  *Id.* at 682, 684.  In reaching this conclusion, Judge Sparks rejected the plaintiffs' analogy to cases involving insurance claims adjusters, in part because claims adjusters "have a special place in FLSA jurisprudence."[17]  *Id.* at 683-84.

---

[17] For example, in *Roe-Midgett* v. *CC Services, Inc.*, 512 F.3d 865, 867 (7th Cir. 2008), the plaintiffs were material damage appraisers who provided claims adjustment services for the insurance companies that contracted with their employer to provide claims processing services for auto, home, and other policies.  The Seventh Circuit rejected the plaintiffs' argument that the appraisers produced the defendants' "product" of claims processing services because the plaintiffs provided a service to the defendant's customer that was administrative in nature *in relation to the customer's business*.  *Id.* at 872.  In other

There are two important distinctions between this case and *Clark* that render this case more like such First Circuit cases as *Hines* and *Cash*, and the CQACs more like the claims adjusters in other cases.

First, unlike the nurses in *Clark*, the CQACs do not actually produce, manufacture, or author the utilization review reports that are provided to the defendants' clients.  Instead, they perform quality control, reviewing the reports for accuracy, legal compliance, and "the highest quality and integrity."  This work is not akin to "general administrative work applicable to the running of any business" but rather is unique to this particular industry and is "related to the business's overall efficiency or mode of operation."  *Davis*, 587 F.3d at 535.

Second, as with the claims adjusters, the quality assurance work performed by the CQACs is explicitly contemplated as "[w]ork directly related to management or general business operations" by the regulations.  *See* 29 C.F.R. § 541.201(b)

---

words, because the customers were in the business of selling insurance policies, and employees of the customer who process claims under the policies would be performing an administrative function for their own employer, employees of the defendant who were providing this service to the defendant's customer should be considered in the same manner.  Treating employees with identical duties differently based on who their employer is, the Seventh Circuit reasoned, would be illogical.  *Id*. at 872-73.

(duty requirement can be satisfied by work in areas such as "auditing; insurance; quality control . . . and similar activities"). This categorization makes sense because quality assurance employees like the CQACs perform an ancillary and important service by ensuring the quality of the product produced by the defendants, which in turn assists the running of the defendants' business. *See* 29 C.F.R. § 541.201(a); *cf.* *Hines*, 665 F.3d at 242-43 (plaintiff sales managers performed service that was "clearly ancillary to the principal function of actually providing the banquet services themselves").

There is, of course, line drawing necessary to define the scope of this exemption. For example, "quality control" work is generally exempt, whereas "[o]rdinary inspection work" and work involving examination or grading of products is generally not exempt. *See* 29 C.F.R. § 541.203(g), (h). The distinction appears to lie in whether the employees' duties go beyond the routine performance of an ancillary function and require a greater, more direct level of engagement with the work of the company. *Compare* 29 C.F.R. § 541.203(a) (insurance claims adjusters are presumptively exempt because "their duties include . . . interviewing insured, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding

coverage of claims; determining liability . . . ; and making
recommendations regarding litigation"), *with* 29 C.F.R.
§ 541.203(g) ("ordinary inspection work" is presumptively non-
exempt because inspectors "normally perform specialized work
along standardized lines involving well-established techniques
and procedures . . . . [and] within closely prescribed limits").
Here, the CQACs interface directly with the reviewing physicians
and the clients to ensure that the defendants' product meets the
expectations of their clients and is something the clients can
understand and trust.   Their duties in reviewing the reports
are not quite at the level of an insurance claims adjuster but
certainly exceed that of "ordinary inspection work."
Accordingly, I conclude that this prong is satisfied.

*Second Duty Requirement: Exercise of Discretion and Independent*
*Judgment*

        To qualify for the administrative exemption, the primary
duty must also "include the exercise of discretion and
independent judgment with respect to matters of significance."
29 C.F.R. § 541.202(a).   This generally "involves the comparison
and the evaluation of possible courses of conduct, and acting or
making a decision after the various possibilities have been
considered."  *Id.*  Whether an employee exercises discretion and
independent judgment is a fact-specific inquiry, guided by a

52

non-exhaustive list of regulatory factors including "whether the employee carries out major assignments in conducting the operations of the business" and "whether the employee investigates and resolves matters of significance on behalf of management."  *Id.* § 541.202(b).

Based on the job description and the accounts provided by the CQAC plaintiffs and supervisors, I conclude that the quality assurance work requires the exercise of discretion and independent judgment, specifically in determining whether the reviewing physician's rationale is supportable.  As with the URNAs, determining whether the information in the case file "was sufficient to demonstrate that a request was related to the injury" involves discretion and independent judgment.  *See Withrow*, 841 F. Supp. 2d at 981.  Although the result when a CQAC concludes that the reviewing physician has erred or that his or her rationale is not clear is not necessarily a denial of the request, but rather a conversation with the reviewing physician and a recommendation of an alternative determination, the CQAC makes an independent choice in reaching this conclusion.  *See id.; see also Hines*, 665 F.3d at 246.  The resulting "recommendation for action" can adequately satisfy the discretion requirement.  29 C.F.R. § 541.202(c).

The plaintiffs' assertions that they "had no decision-making authority and functioned merely as a liaison" are not only conclusory but also directly rebutted by Bowen's own testimony that she conducted a clinical review of the reviewing physician's report and could request clarification and further review by the physician, and by Troiano and Bolstad's testimony, which also indicated that the CQACs' review was more than merely mechanical. *See O'Neill-Marino* v. *Omni Hotels Mgmt. Corp.*, No. 99 Civ. 3793, 2001 WL 210360, at *9 (S.D.N.Y. Mar. 2, 2001). That the CQACs also performed more ministerial tasks in conducting quality assurance – such as checking for grammar, spelling, and formatting – does not serve to lessen the judgment entrusted to them regarding the substance of the report. Similarly, that the CQACs are guided in their review by the applicable medical guidelines does not eliminate their discretion, particularly where the guidelines themselves, as discussed above, emphasize the need for independent judgment and application of medical knowledge. *See* 29 C.F.R. § 541.202(e); *id.* § 541.704; *see also McAllister* v. *TransAmerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003).

The CQACs' exercise of discretion and independent judgment in communicating with reviewing physicians to ensure adequate information, reviewing the physician's reports, ensuring their

accuracy, and transmitting them back to the insurer involve

matters of significance.  Providing physician review and

approval of a request for treatment subject to worker's

compensation is at the core of the defendants' business as a

utilization review company.  The role that CQACs play in this

clearly occupies a "level of importance or consequence" for both

the defendants and their clients.  *See* 29 C.F.R. § 541.202(a).

By facilitating physician review of a request, ensuring its

clinical appropriateness and technical accuracy, and providing

that review to the client, CQACs engaged in "work that affects

business operations to a substantial degree, even if the . . .

assignments are related to operation of a particular segment of

the business."  *Id.* § 541.202(b).  Accordingly, I conclude that

this prong is satisfied as well.

In sum, the defendants have carried their burden of

demonstrating that the CQACs are exempt under the administrative

exemption, and the plaintiffs have not demonstrated any genuine

issue of material fact that precludes this determination.  For

this reason, I will deny the CQAC plaintiffs' motion for summary

judgment on Count I as to the time period prior to

reclassification, and grant the defendants' motion for summary

judgment on this Count as to the CQAC plaintiffs, but only as to

the time period prior to reclassification.

## 2.   Count II: Failure to Pay Overtime Under FLSA

I turn next to Count II, which alleges that the defendants failed to pay overtime as required by the FLSA.  The plaintiffs claim that they worked off the clock without pay with their supervisors' knowledge, and that the supervisors modified timecards to prevent employees from receiving pay for overtime hours worked, including when they worked through lunch.

Under 29 U.S.C. §§ 206 and 207, an employee is entitled to minimum wage and to "compensation for his employment in excess of [forty hours per workweek] at a rate not less than one and one-half times the regular rate at which he is employed," unless the employee is deemed exempt from these provisions under 29 U.S.C. § 213 and the accompanying regulations.  Although I have concluded that the CQAC plaintiffs were exempt from the FLSA requirements prior to their reclassification, they cannot be said to be exempt after their reclassification in April 2012. Accordingly, I must assess whether the defendants are subject to liability for non-compliance with the FLSA in relation to the URNA plaintiffs as to all relevant time periods and in relation to the CQAC plaintiffs as to the time period following reclassification.

To succeed on a claim for overtime wages under the FLSA, at least two requirements must be met: first, the non-exempt

56

plaintiffs must establish that they actually worked beyond forty
hours in a work week for which they were not compensated and
which constitute compensable overtime, and second, they must
establish that their employer knew or should have known that
they were working overtime.  *See Manning* v. *Bos. Med. Ctr.
Corp.*, 725 F.3d 34, 43 (1st Cir. 2013); *Harvill* v. *Westward
Commc'ns*, 433 F.3d 428, 441 (5th Cir. 2005); *see also* 29 U.S.C.
§ 203(g).  "[W]here an employer has no knowledge that an
employee is engaging in overtime work and that employee fails to
notify the employer or deliberately prevents the employer from
acquiring knowledge of the overtime work, the employer's failure
to pay for the overtime hours is *not* a violation of § 207(a)."
*Harvill* v. *Westward Commc'ns, LLC*, 311 F. Supp. 2d 573, 583–84
(E.D. Tex. 2004), *aff'd*, 433 F.3d 428 (5th Cir. 2005).
Accordingly, actual or constructive knowledge on the part of the
employer is required for an overtime claim.  *See Manning*, 725
F.3d at 44.  A rule or policy against unauthorized overtime or
requiring prior approval for any work that would result in
overtime can prevent an employer's liability for overtime if it
is enforced.  *See* 29 C.F.R. § 785.13; *see also Chao* v. *Gotham
Registry, Inc.*, 514 F.3d 280, 288–89 (2d Cir. 2008).

     There are a number of factual disputes regarding the
overtime the plaintiffs worked, the defendants' awareness of

this overtime, and the existence and enforcement of an overtime
policy that preclude summary judgment on this Count.

These factual disputes are readily apparent in the
testimony of the plaintiffs and their supervisors.  Chansky, an
URNA plaintiff, testified that she ate lunch at her desk, and
most other URNAs did too.  She testified that although Geraldine
Dolan, the URNAs' supervisor, never told the URNAs to work
through lunch, "it was the expectation to keep working," and
that Dolan herself ate lunch in her office.

Dolan testified that she did not observe whether the
employees took thirty-minute meal breaks until after this
lawsuit was filed, and no one ever complained to her about being
inaccurately clocked in or out for a lunch break or having an
inaccurate timesheet.

Consistent with Dolan's testimony, Crowe testified that she
never spoke to anyone about working outside of the times she was
clocked in and out, but nonetheless stated in her affidavit that
her supervisors were aware of her overtime work.  Crowe further
stated that she regularly worked 7-10 hours over 40 in a week
before and after reclassification, during lunch breaks and at
the end of the day, and that her supervisors knew she was
working these additional hours but ignored it.  She also stated
that she occasionally started working before she punched in

58

"because of the work load," even though no one told her to do so.  Clarke, another URNA, stated that she regularly worked 5-7 extra hours per week without pay both before and after reclassification.

O'Day, a CQAC plaintiff, stated that after reclassification, she was assigned to work 32 hours per week, but would sometimes work 2-5 additional hours per week without pay.  O'Day further testified that she was permitted to take a morning break and a lunch break if she wanted to, but she often did not.  In contrast, Julianne DiCastro-Nascenz, another URNA who is not a plaintiff in this case, testified that she was always paid for any overtime she worked.

Sky Lucier, a CQAC supervisor, testified that she could not remember any of the employees she supervised reporting that they had worked more than forty hours in a workweek after reclassification, but also that she had authorized some CQACs to work overtime when there was additional work to be done.

This testimony leaves several core factual determinations unresolvable.  First, the precise number of excess hours the plaintiffs worked, and whether these hours qualify as overtime, are unclear.  Second, it is disputed whether Dolan or another supervisor or manager had knowledge that the plaintiffs worked overtime.  Third, the employee handbooks for MES and ExamWorks

set forth explicit overtime policies that, if enforced, could

relieve the defendants of liability.[18]  *See* 29 C.F.R. § 785.13.

Although Dolan testified that she could not recall whether there

was an overtime policy in the employee handbook, she also

testified to engaging in a practice that is consistent with the

policy from October 2012 until the filing of this lawsuit.

During that time period, Dolan altered employees' timecards to

reflect a forty-hour workweek because it was her understanding

that they needed to work exactly eight hours a day unless they

---

[18] The MES Handbook explains when employees will be asked to work
overtime and indicates that overtime must be approved in advance
by a manager.  It indicates that "non-exempt" employees will be
paid time and a half for any time over forty hours per week or
eight hours per day.  In addition, it states that employees are
entitled to two fifteen minute breaks for eight hours each day,
that "[e]mployees may have an unpaid lunch up to one hour," and
that employees will not be compensated for the lunch period
"[u]nless your job requires that you must remain at your work
station."

The ExamWorks Handbook articulates even more specific
policies regarding work hours, overtime, and meal and rest
breaks.  It indicates that non-exempt employees will be paid
overtime for hours worked in excess of forty in a workweek, and
that such employees "must receive approval from their supervisor
prior to performing overtime work."  It states that employees
"should not perform any work before your normal schedule begins"
and should "not clock in more than 10 minutes before your
normally scheduled shift" or "clock out . . . more than 10
minutes after the end of your scheduled shift."  It further
indicates that employees should not perform work unless they are
"on the clock."  In addition, employees "should leave [their]
workstations or work area for a period of at least 30 minutes"
during the meal break or otherwise should not perform work
during this time.  Rest periods or breaks are not specifically
provided for but may be available to employees.

60

had obtained approval to work overtime.  Lucier testified that this was her understanding as well.

In short, the present factual record leaves too many open questions that cannot be resolved at this stage.  Accordingly, I will deny summary judgment on Count II.

To the extent the CQAC plaintiffs pursue claims under Count II as to pre-reclassification overtime, there is no basis as a matter of law for that claim.  Although the defendants did not separately move for summary judgment on Count II, I may enter summary judgment *sua sponte* when "there has been a reasonable opportunity to glean material facts through the discovery process" and "the targeted party received appropriate notice of opportunity to present evidence on the essential elements of the claim or defense."  *Tucard, LLC* v. *Fidelity Nat'l Prop. & Cas. Ins. Co.*, 567 F. Supp. 2d 215, 222 (D. Mass. 2008) (citation omitted); *see Bank* v. *Int'l Bus. Machs. Corp.*, 145 F.3d 420, 431 (1st Cir. 1998); *see also* Fed. R. Civ. P. 56(f)(1) (court may grant summary judgment for nonmovant).  I find that both of these criteria are satisfied here, particularly where the defendants defended against the plaintiffs' own motion for summary judgment on this Count.  For this reason, I will grant summary judgment for the defendants on Count II only as to the

CQAC plaintiffs and as to them only as to the pre-
reclassification period.

> ### 3.   Count IV: Failure to Pay Overtime Under Massachusetts Overtime Law

Count IV alleges willful deprivation of overtime pay under
Mass. Gen. Laws ch. 151, § 1A, both before and after
reclassification, as to all the named plaintiffs and the
putative class, under substantially the same theories as
discussed for Count II.  Although the plaintiffs move for
summary judgment on this Count, their briefing does not offer
any more than passing references to it.  Regardless, my
resolution of Count II is equally applicable here.  *See Valerio*
v. *Putman Assocs. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999)
(Massachusetts overtime provisions are identical to FLSA);
*Goodrow* v. *Lane Bryant, Inc.*, 732 N.E.2d 289, 294 (Mass. 2000)
(same).  The same factual disputes precluding summary judgment
on Count II preclude summary judgment on Count IV as well.  *See
Valerio*, 173 F.3d at 40.  As with Count II, however, I will
grant summary judgment for the defendants on Count IV as to the
CQAC plaintiffs pre-reclassification only, because they were
exempt and therefore ineligible for overtime pay as a matter of

law.[19]  *See Bank*, 145 F.3d at 431; *Tucard*, 567 F. Supp. 2d at 222.

**C.   *Defendants' Motion for Summary Judgment***

> 1.   Count I: Misclassification Under FLSA

For the reasons set forth above, I conclude that the defendants have met their burden of demonstrating that the administrative exemption applies to the CQACs post-reclassification, but have not met their burden of demonstrating that the learned professional exemption applies to either the CQACs or the URNAs.  Accordingly, I will grant summary judgment for the defendants on Count I as to the CQAC plaintiffs only, limited as previously mentioned, to the pre-reclassification period.

> 2.   Count III: Misclassification Under Massachusetts Law

Count III alleges misclassification of the plaintiffs and other similarly situated class members as exempt employees in violation of Mass. Gen. Laws ch. 149, § 148.[20]  The definition of

---

[19] One of the named CQAC plaintiffs, Diane Bowen, left the company before the reclassification, and accordingly has no viable claims under Counts II or IV.  For this reason, I will grant summary judgment for the defendants as to all of Bowen's claims under these Counts as well.

[20] The plaintiffs identify Mass. Gen. Laws ch. 149, § 148, as the statutory basis for their misclassification claim because it pertains to the timely payment of wages, including overtime wages.  *See O'Brien* v. *Lifestyle Transp., Inc.*, 956 F. Supp. 2d 300, 309 (D. Mass. 2013).  Massachusetts General Laws ch. 151,

exempt employees under Massachusetts law, like the overtime pay provisions, mirrors that of the FLSA.  *See Valerio*, 173 F.3d at 40; *O'Donnell* v. *Robert Half Int'l, Inc.*, 534 F. Supp. 2d 173, 183 n.3 (D. Mass. 2008); *Swift* v. *AutoZone*, 806 N.E.2d 95, 100 (Mass. 2004); *see also* Mass. Gen. Laws ch. 151, § 1A; 455 Mass. Code Regs. 2.02(3).  Because "both the FLSA and Massachusetts law compel the same outcomes," *Valerio*, 173 F.3d at 40, I will grant summary judgment for the defendants on Count III as to the CQAC plaintiffs pre-reclassification only.  Similarly, I will grant summary judgment for the plaintiffs on Count III as to the CQAC and URNA plaintiffs post-reclassification, during which time the plaintiffs were non-exempt employees.  *See Bank*, 145 F.3d at 431; *Tucard*, 567 F. Supp. 2d at 222.

### III. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The plaintiffs move for certification of the following class as to their state law claims under Counts III, IV, and V:[21]

"All individuals Defendant Examworks, Inc. and Defendant MES

---

§§ 1, 1A, sets forth the standards for classification of employees and exemptions.

[21] Count III alleges misclassification as exempt employees under Mass. Gen. Laws ch. 149, § 148; Count IV alleges willful deprivation of overtime pay under Mass. Gen. Laws ch. 151, § 1A, both before and after reclassification; and Count V alleges breach of contract in failing to pay the plaintiffs for all hours worked and to provide a thirty-minute meal break.  *See Salvas* v. *Wal-Mart Stores, Inc.*, 893 N.E.2d 1187, 1216-17 (Mass. 2008); Mass. Gen. Laws ch. 149, § 100.

Group, Inc. employed as Clinical Quality Assurance Coordinators and Utilization Review Nurse Auditors in Norwood, Massachusetts, from January 13, 2007 to the present."

## A.    *Rule 23 Requirements*

To obtain class certification, the plaintiffs must initially establish each of the four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a); *see Smilow* v. *Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 614 (1997); *see also Garcia* v. *E.J. Amusements of N.H., Inc.*, Civ. Action No. 13-12536-PBS 2015 WL 1623837, at *1-2 (D. Mass. Apr. 13, 2015) (Rule 23 governs class certification of Massachusetts wage and overtime claims), *appeal filed* (No. 15-8011) (1st Cir. Apr. 28, 2015).  I find that the plaintiffs have demonstrated each of these requirements by a preponderance of the evidence for Counts III and IV.  *See Gen. Tel. Co. of Sw*. v. *Falcon*, 457 U.S. 147, 161 (1982).

The class as revealed through discovery is sufficiently numerous.  The plaintiffs have identified 47 employees who would potentially qualify for the class: 42 CQACs and 5 URNAs.[22]  *See*

---

[22] The defendants contend that only 17 of these individuals qualify for the class, because 29 of the listed class members

*Reid* v. *Donelan*, 297 F.R.D. 185, 188-89 (D. Mass. 2014); *DeRosa* v. *Mass. Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 97-98 (D. Mass. 2010).

The commonality requirement is clearly met for Count III, is barely met for Count IV, and is not met for Count V. Although commonality has been described as a "low hurdle," requiring "a single common legal or factual basis," *O'Donnell*, 534 F. Supp. 2d at 183, the Supreme Court has emphasized that commonality requires some "demonstrat[ion] that class members 'have suffered the same injury'" based on "a common contention . . . capable of classwide resolution." *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Falcon*, 457 U.S.

---

had supervisors who never engaged in the improper practices the plaintiffs allege, and one of the listed class members has testified that she was not subject to the allegedly improper policies. It has not been established at this stage, however, whether or not any of the putative class members or named plaintiffs were deprived overtime wages. The defendants narrow the list to 17 by offering the testimony of two of the CQAC supervisors that they did not alter time cards, and arguing that the plaintiffs have not offered any evidence that four of the CQAC supervisors (the two who testified included) engaged in any inappropriate behavior. But the plaintiffs are not required to prove their case as to every putative class member at this stage. It is sufficient that there is a genuine dispute regarding the named CQAC plaintiffs and the conduct of those plaintiffs' supervisors to create a plausible inference that other employees in the same position may have similar claims. As a result, I do not find the plaintiffs' estimate to be "purely speculative." *Cf. Makuc* v. *Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir. 1987).

66

at 157).  "[I]ndividualized issues regarding the amounts of damages and who is entitled to recover," however, are inquiries better suited for the typicality and predominance requirements. *See Martins* v. *3PD, Inc.*, Civ. Action No. 11-11313-DPW, 2013 WL 1320454, at *6 (D. Mass. Mar. 28, 2013).

There is at least one common question of law or fact here: the CQAC and URNA positions' qualification for exemption under Massachusetts overtime law.[23]  A classwide proceeding could "generate [a] common *answer*" to this question of classification "in one stroke" that would be "apt to drive the resolution of the litigation," because a threshold determination whether the employees are exempt or non-exempt is necessary for the resolution of the statutory overtime pay claims.  *See Dukes*, 131 S. Ct. at 2551 (citation omitted).  Although this single common question is effectively resolved by Count III, it is arguably a

---

[23] I am not persuaded by the defendants' suggestion that because the CQAC and URNA positions require different exemption analyses, they necessarily preclude common resolution, or their suggestion that the misclassification analysis requires individualized inquiries.  The defendants engage in a game of semantics by latching on to the phrase "common answer" in the *Dukes* case and contending that "there is no common *answer* for why any particular reclassification occurred."  The question requiring an answer is not *why* the CQACs and URNAs were classified as exempt and then reclassified as non-exempt, but whether the CQACs and URNAs can properly be considered exempt or not.  This question can be answered collectively.

necessary predicate for a claim under Count IV.[24]  These common questions do not, however, hold true for Count V, where an assessment of liability requires wholly individualized determinations regarding hours worked and the provision of meal breaks.[25]

The typicality requirement is similarly satisfied.  On Count III, although there are factual distinctions between the CQACs and the URNAs overall, there are no such differences between individual employees within the groups.  As to Count IV

---

[24] It is somewhat strained to say that this common question, already resolved by Count III, can serve to satisfy the commonality requirement for Count IV.  Nonetheless, I will consider it sufficient here where I find that Count IV ultimately fails on predominance grounds under Rule 23(b).
[25] Count V presents a common law claim for breach of contract distinct from the statutory requirements.  *See Lipsitt* v. *Plaud*, 994 N.E.2d 777, 785-87 (Mass. 2013).  This Count hinges on whether any individual employee worked through lunch, how often, and whether that work was done at the direction of the supervisor or known to the supervisor.  Such individualized inquiries are necessary to determining not just damages but, more fundamentally, liability.  *See, e.g.*, *Babineau* v. *Fed. Exp. Corp.*, 576 F.3d 1183, 1191-92 (11th Cir. 2009) (individual inquiries necessary to determine liability for deprivation of breaks); *Raposo* v. *Garelick Farms, LLC*, 293 F.R.D. 52, 56-57 (D. Mass. 2013) (liability contingent on individualized reasons for working through meal breaks and whether plaintiffs had already been compensated for such work); *Gonzalez* v. *Officemax North Am.*, Nos. SACV 07-00452 JVS (MLGx), CV 07-04839 JVS (MLGx), 2012 WL 5473764, at *5 (C.D. Cal. No. 5, 2012) ("Since [the employer] is liable only for missed meal periods that it forced the Employees to forgo, the reason that any particular employee missed any particular break requires, ineluctably, individualized fact finding."); *see also Basco* v. *Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 602-04 (E.D. La. 2002).

(and Count V, although it is inapposite), the relief the named plaintiffs seek is the same as that sought by the class overall: compensation for overtime hours worked as a non-exempt employee, in varying degrees of amount. *See Espinoza* v. *Assocs. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y. 2011).  The defendants have not identified any particular defenses that would apply to only the named plaintiffs, or only to others in the class.  *In re Credit Suisse — AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008). The named plaintiffs therefore show substantial identity and "share essential characteristics" with the class overall.  *See Swack* v. *Credit Suisse First Bos.*, 230 F.R.D. 250, 260 (D. Mass. 2005); *cf. George* v. *Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 176 (D. Mass. 2012); *Piper* v. *Portnoff Law Assocs.*, 216 F.R.D. 325, 329 (E.D. Pa. 2003).

Finally, the adequate representation requirement is satisfied.  The named plaintiffs' active involvement in the case and shared common interests with the class demonstrate that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Similarly, plaintiffs' counsel appears "qualified, experienced and able to vigorously conduct the proposed litigation."  *Andrews*, 780 F.2d at 130. Accordingly, the Rule 23(a) requirements are satisfied for Counts III and IV.

**B.    Rule 23(b)(3) Predominance Requirement**

The plaintiffs must also satisfy one of the elements of Rule 23(b) to obtain class certification.  *See Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1432 (2013).  Under Rule 23(b)(3), class certification is appropriate if I find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

To satisfy the predominance requirement, the proposed class must be "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *see Comcast*, 133 S. Ct. at 1432.  This requirement is "similar to but more demanding than the commonality requirement." *Bezdek* v. *Vibram USA Inc.*, 79 F. Supp. 3d 324, 340 (D. Mass. 2015).  The focus is on "the relative importance and prevalence of the different issues within the lawsuit," *George*, 286 F.R.D. at 179, in relation to what must be proved for the underlying cause of action.  *See Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).  Considerations of efficiency and judicial economy drive the assessment of superiority of a class action.  *See Otte ex. rel. Estate of Reynolds* v. *Life Ins. Co. of N. Am.,* 275 F.R.D. 50, 58 (D. Mass. 2011).

70

Common questions predominate with respect to Count III.[26]
Neither party has presented evidence suggesting that the
responsibilities of the individual CQACs or URNAs were so
different as to prevent resolution of the positions' exemption
on a classwide basis.  If there is an injury to be found in
misclassification, liability is capable of proof common to the
class, parsing only as to CQACs and URNAs generally.  *See
Comcast*, 133 S. Ct. at 1436-37.  This is sufficient to satisfy
the predominance standard "even if damages are not provable in
the aggregate."  *Id*. at 1437.  In addition, resolution of such
employment classification claims by class action is superior to
individual adjudication.  *See Martins*, 2013 WL 1320454, at *8-9.

The same cannot be said of Count IV, whose only common
question is resolved by Count III, and which otherwise requires
individualized assessments to determine both liability and

---

[26] The First Circuit has observed that it is appropriate to
"tak[e] into account the common nucleus of operative facts and
issues, even though certain of these already ha[ve] been
resolved, when . . . deciding whether to certify the class."
*Waste Mgmt. Holdings, Inc*. v. *Mowbray*, 208 F.3d 288, 299 (1st
Cir. 2000) ("[T]he fact that an issue has been resolved on
summary judgment does not remove it from the predominance
calculus.  A certification decision is still necessary to
determine whether the prior resolution carries res judicata
effect with respect to purported class members.").  Although my
earlier analysis makes clear that the CQACs are properly
classified as exempt, and therefore a misclassification claim as
to those individuals cannot lie, there is some possibility that
the URNAs could succeed in their misclassification claim.

damages.[27]   This Count alleges that the CQACs and URNAs were
deprived overtime pay under the Massachusetts Wage Act.   The
employee handbooks for MES and ExamWorks set forth policies that
on their face comply with the meal break and overtime
requirements imposed by Massachusetts law.   *See* Mass. Gen. Laws
ch. 149, § 100 (employee must be provided a 30-minute lunch
break when working for a period of 6 hours or more, and must be
relieved of all duties during this time period, but need not be
paid for the time; rest breaks are not required); Mass. Gen.
Laws ch. 151, § 1A (non-exempt employees must be paid one and
one half times the regular rate for hours worked over forty
hours in a work week); *see supra*, Section II.B.2 (discussion of
policies).   The plaintiffs have not alleged or identified a
consistent practice or unofficial policy across supervisors or
employees departing from those set forth in the handbook – such
as not paying for overtime that is owed, directing employees to
work through lunch (and not properly compensating them), or
modifying timecards – that would permit classwide resolution of
the claims raised in Count IV, other than identifying a general
"pressure" within the company to complete the caseload in a

---

[27] Count V would not survive the predominance inquiry for similar
reasons, but I have found this Count inadequate on commonality
grounds under Rule 23(a).

timely fashion.  Instead, the plaintiffs have offered ad hoc
indications that some supervisors engaged in such practices as
to individual employees, and accordingly that some supervisors
may have implemented the official policies improperly.[28]

Although Count IV requires resolution of a common threshold
issue – whether the CQACs and URNAs are properly considered non-

---

[28] This lack of a common practice of denying overtime pay or meal
breaks across the company makes this case distinguishable from
*George* v. *National Water Main Cleaning Co.*, *George* v. *Nat'l
Water Main Cleaning Co.*, 286 F.R.D. 168, 179-181 (D. Mass.
2012), a case on which the plaintiffs rely.  In *George*, the
plaintiffs alleged that the defendants "had a uniform policy to
use a wage system that either was itself, or that caused, wage
violations."  *Id.* at 181.  The claim that the wage policies at
issue "facially violated state law" meant that "little
individual inquiry" would be required.  *Id.* at 182.  The remedy
for the unlawful conduct would "involve[ ] reconstructing the
correct wage algorithm" – a remedy that would be applicable to
all class members.  *Id.* at 181-82.  Accordingly, Judge Casper
rejected the defendants' arguments that "class certification is
improper because to calculate any damages owed to a putative
class member, one must confront, as a predominating issue, the
variability, specificity and accuracy of the time cards" of the
employee class members, because "the initial determination of
liability" depended on the employer's wage practices.  *Id.* at
179.  Individualized timecard recording issues were distinct and
subsidiary to this classwide question regarding the defendants'
common policies and wage payment practices, and could be
addressed in individual proceedings after resolution of the
classwide issues.  *Id.* at 179, 181.  Other courts have reached a
similar conclusion where a common policy or practice is the
basis for the liability.  *See, e.g.*, *Ramos* v. *SimplexGrinnell
LP*, 796 F. Supp. 2d 346, 359 (E.D.N.Y. 2011) ("whether defendant
systematically failed to pay its employees the prevailing wages
due them" predominates over individualized differences in
employee time cards and employee activities), *vacated in part on
other grounds*, 773 F.3d 394 (2d Cir. 2014) (per curiam).

exempt and therefore entitled to overtime wages – individual
issues regarding overtime hours actually worked and whether
those hours were worked with a supervisor's knowledge or at a
supervisor's direction predominate over this question and "go
directly to questions of liability." *Martins*, 2013 WL 1320454,
at *8; *see Manning*, 725 F.3d at 44 (actual or constructive
knowledge by employer of excess hours worked is required for
FLSA overtime claim); *Valerio*, 173 F.3d at 40 (Massachusetts
overtime provision "is essentially identical to the FLSA"); *see
also Prime Comm'cns, Inc.* v. *Sylvester*, 615 N.E.2d 600, 602
(Mass. App. Ct. 1993) (if "employer has no knowledge that an
employee is engaging in overtime work and that employee fails to
notify the employer or deliberately prevents the employer from
acquiring knowledge of the overtime work, the employer's failure
to pay the overtime hours is not a violation of [FLSA]"
(citations and internal quotation marks omitted)).  Additional
individualized issues arise with regard to timecard
modification, including when and why any given employee's
timecard was changed, and whether an individual employee has
already received pay for the overtime hours worked.  As I have
observed previously, there is "a strong [judicial] preference
for rendering decisions on the classification of employees on
[a] class wide basis," because "a company's employee-

classification scheme applies to all individuals classified
under it," but "the company's treatment of those employees [once
classified] may differ widely."  *Martins*, 2013 WL 1320454, at
*9.  As a result, individual questions often predominate over
the claims that derive from classification.  *Id.*  That is the
case here.

Highly individualized questions based on the employee, the
supervisor, and the specific circumstances of that relationship
are core to the liability determinations necessary for Count IV
and preclude class certification on this Count.[29]  *See Babineau*
v. *Fed. Exp. Corp.*, 576 F.3d 1183, 1191-92 (11th Cir. 2009)
(denying class certification on employees' claim that individual
employees worked during break times despite policy directing
them not to, because liability could not be determined absent
inquiry into each employee's work arrangements); *Raposo* v.

---

[29] The plaintiffs' attempts to manufacture a common, predominant
issue by arguing that the damages calculation – once liability
is established – will be uniform across class members are
unavailing, where individualized questions are so central to a
determination of liability and to the resulting damages that
each employee may have suffered.  More importantly, the
plaintiffs have not yet established that all of the employees
included in the class have been deprived of overtime pay or meal
breaks.  Whether a class that includes individuals who have
suffered no injury – and accordingly who have no legal right to
damages – may be certified is an issue before the Supreme Court
this term.  *See Bouaphakeo* v. *Tyson Foods, Inc.*, 765 F.3d 791
(8th Cir. 2014), *cert. granted*, 135 S. Ct. 2806 (Mem.) (June 8,
2015) (No. 14-1146).

*Garelick Farms, LLC*, 293 F.R.D. 52, 56–57 (D. Mass. 2013) (assessment of whether "all drivers in the class work through meal breaks and, if so, why" and whether "any driver [who] worked through meal breaks . . . was compensated for that time," were incapable of classwide resolution because "reasons for doing so vary from driver to driver and from day to day"; in addition, assessment of whether "Drivers were compensated for working breaks" was also incapable of classwide resolution because entrustment of employment patterns to discretion of supervisors resulted in non-uniform employment practice incapable of broad evaluation); *Cornn* v. *United Parcel Serv., Inc.*, No. C03-2001, 2005 WL 2072091, at *2-65 (N.D. Cal. Aug. 26, 2005) (denying class certification on employees' claim that they performed various procedures before beginning work that warranted compensation, because company had policy instructing employees not to work prior to scheduled start times, and plaintiffs produced insufficient evidence of classwide practice to the contrary giving rise to liability); *Basco* v. *Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 602-04 (E.D. La. 2002) (denying class certification due to "plethora of individual issues" determinative of liability and damages on plaintiffs' claim of breach of contractual agreement to provide rest and meal breaks, and "myriad of possibilities . . . to explain why

any one of the plaintiffs worked off-the-clock" on deprivation of pay claims); *see also Garcia*, 2015 WL 1623837, at *5 (distinguishing between cases in which "courts have rejected class certification where a determination of liability would require a burdensome inquiry into each employee's individual circumstances," and those in which "employees alleged per se illegal wage policies that violated the rights of all class members"); *George*, 286 F.R.D. at 182 (distinguishing between cases involving common policy or practice and the *Babineau-Cornn-Basco* line of cases).

In sum, although common questions of law and fact predominate regarding the misclassification claim in Count III, individual issues predominate regarding Count IV and destroy the efficiencies that would be obtained from trying the deprivation of overtime pay claim as a class. *See O'Donnell*, 534 F. Supp. 2d at 184.  Count V similarly requires individualized liability determinations and possesses no common question that would permit classwide resolution.  Accordingly, I will grant the plaintiffs' motion for class certification as to Count III, but deny it as to Counts IV and V.

## IV. CONCLUSION

I end with a brief summary of the disposition of the motions.  When the defendants reclassified the URNAs and CQACs,

77

they changed their pay arrangements such that those positions no longer satisfied the salary basis test required for exemption from the FLSA.  Accordingly, the plaintiffs are entitled to summary judgment on Counts I and III as to the URNA and CQAC plaintiffs for the post-reclassification period only, because as a matter of law neither position can satisfy the salary basis test for exemption from that point forward.

The defendants have demonstrated as a matter of law that the CQAC position qualifies for the administrative exemption to the FLSA, and are accordingly entitled to summary judgment on Counts I and III for the pre-reclassification period for the CQAC plaintiffs.

Genuine disputes of material fact remain regarding the exempt status of the URNA plaintiffs under the learned profession exemption during the pre-reclassification period. Accordingly, summary judgment is denied to both parties on Count I, and to the defendants on Count III,[30] as to those plaintiffs for the pre-reclassification period.

Because genuine issues also remain regarding whether and how much overtime the plaintiffs worked during the time periods in which they were non-exempt, the plaintiffs' motion for

---

[30] The plaintiffs have not moved for summary judgment on Count III.

summary judgment on Counts II and IV is denied.  However, the defendants are entitled to summary judgment on Counts II and IV as to the CQAC plaintiffs for the pre-reclassification period, during which the CQACs were exempt from the FLSA and therefore were not eligible for overtime pay under the federal or state statutes.[31]

The merits of their claims aside, the plaintiffs have satisfied the prerequisites for class certification on Count III, but have not done so for Counts IV and V.

Accordingly, for the reasons and on the terms set forth above, I:

- GRANT in part and DENY in part the Plaintiffs' Cross-Motion for Partial Summary Judgment, Dkt. No. 163;

- GRANT in part and DENY in part the Defendants' Renewed Motion for Summary Judgment, Dkt. No. 166; and

- GRANT in part and DENY in part the Plaintiffs' Motion for Class Certification of Their State Law Claims, Dkt. No. 180.

---

[31] Otherwise, the defendants do not move for summary judgment on Counts II and IV.

The parties are directed to submit a status report on or before October 16, 2015 proposing the means for reducing this case to a final judgment.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE